# EXHIBIT 1

# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1 **This Charter Party**, made and concluded in Toronto,.............30th day of *December* ..........19.........….........…....*2016*

2 Between *"OCEANSTAR MARITIME CO.".*...........................................................................................................

3 ~~*Istanbul*~~ as Owners ~~*manager*~~ of the good....Steamship/Motorship *"Yasa Aysen "* ...................…..................................……......of

4 ~~of .........tons gross register, and ...............tons net register, having engines of ...........................................indicated horse power~~

5 ~~and with hull, machinery and equipment in a thoroughly efficient state, and classed~~ ( *See Clause 67*)........................................

6 ~~at .......of about.........cubic feet ..............bale capacity~~ .............................. ~~and about ...............~~ .............. ~~tons of 2240 lbs.~~

7 ~~deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,~~

8 ~~allowing a minimum of fifty tons)~~ on a draft of ~~feet.... inches on~~.. Summer freeboard, inclusive of............. ~~permanent bunkers,~~

9 ~~which are of the capacity of about.....Tons of fuel, and capable of steaming,~~ .........… .................fully laden,under good weather

10 ~~conditions about ...........of knots on a consumption of about tons of best Welsh coal best grade fuel oil best grade Diesel oil,~~

11 now *trading*..........................................................................................................................................................................

12 ...........and *Norvic Shipping North America Inc,*....................Charterers of the City of *Toronto* …................................

13 **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14 ~~about~~ *One Time charter Trip via Indonesia to East Coast Of India - Bangladesh with lawful /harmless intention coal in,*

15 *bulk always via safe port(s), safe berth(s), safe anchorage(s), always within International Navigating limits, always afloat always accessible. Duration: about 25/30 days without guarantee* within below mentioned trading limits. *Vessel not to trade to areas where ice/ice like conditions prevail and not to push or force ice nor follow ice breakers.*

16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining Responsible for

17 the fulfilment of this Charter Party. *Acceptance of delivery of the vessel by Charterers shall not constitute any waiver of Owners' obligations under this charter party.*

18 Vessel to be placed at the disposal of the Charterers, ~~at~~ *on dropping last outward sea pilot Changjiangkou any time day or night,*

19 *Sundays and holidays included.*

20 ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~

21 ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on her ~~delivery or~~ *latest upon arrival at first* loadport to be

22 ready to receive cargo with clean-swept holds ~~and~~ *Vessel on her delivery to be* tight, staunch, strong and in every way fitted for the service, *and shall remain so for the currency of this time charter* having water ballast, *cargo handling gears* ~~winches~~ and

23 ~~donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other~~ power sufficient to run all the *cargo handling gears* ~~Winches~~ at one and the same

24 ~~time~~ (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25 dise, ~~including petroleum or its products, in proper containers, excluding~~ (*See Clause 39*)......................................................

26 (vessel is not to be employed in the carriage of Live Stock, ~~but Charterers are to have the privilege of shipping a small number on deck at their risk,~~

27 ~~all necessary fittings and other requirements to be for account of Charterers~~), in such lawful trades, between safe port and/or Ports *and safe anchorages* ~~in~~ (also *see clause 42*) ~~British North~~

28 ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~

29 ~~Mexico, and/or South America~~ .........................................................................................................~~and/or Europe~~

30 ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~

31 ~~October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and The Baltic,~~

32 ...........................................................................................................................................................................

33 ...........................................................................................................................................................................

34 ...........................................................................................................................................................................

35 as the Charterers or their Agents shall direct, on the following conditions:

36    1. That the Owners shall provide and pay for all provisions, wages, *including overtime immigration* and consular shipping and discharging fees of the Crew; shall pay for the

37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including ~~boiler water~~ fresh *water and lubricating oil* and maintain her class and keep

1

38    the vessel in a thoroughly efficient state in hull, machinery and equipment *on board* for and during the service *with inspection certificates necessary to comply with safety and health regulations and with reasonable requirements at all ports of call for and  during the service.*

39    2. That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *Canal Tolls, Compulsory, and Customary and highly recommended for similar vessel's* Pilotages, *Pilotage at Singapore for bunkering / Bosphorus including* Canakkale Agencies, Commissions,

40    Consular Charges *garbage removal if compulsory* (except those pertaining to the Crew *or flag of the vessel*), and all other usual expenses except those before stated, but when the vessel puts into

41    a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42    illness of the crew are to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43    charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a Continuous period~~

44    ~~of six months or more.~~ *Owners to provide and keep on board valid deratisation  certificate throughout the time charter period*

45    Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or  unusual cargo, but

46    Owners to allow them the use of any dunnage, and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

47    for dunnage, they making good any damage thereto.

48    3. ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~

49    ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~...................tons ~~and not more than~~

50    ............ ~~tons and to be re-delivered with not less than~~...................... tons ~~and not more than~~...........................tons *(See clause 79)*

51    4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *as per as agreed clause 79*

52    ..................................~~United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and~~

53    ~~stores, on~~ ......................summer  freeboard, *per day* ~~Calendar  Month,~~ commencing on and from the *time and* day of her delivery,    as aforesaid, and at

54    and after the same rate for any part of a *day* ~~month~~; hire to continue until the  *time* ~~hour of the day~~ of her re-delivery *as per Clause 60* in like good order and condition, ordinary

55    wear and tear excepted, to the Owners (unless lost) ~~at~~ *on dropping last outward sea pilot one Safe port/safe berth/safe anchorage East*

56    *Coast India - Bangladesh Range, any time day or night Sunday and holiday included* unless otherwise mutually agreed. Charterers are to give Owners not less than *(see Clause 35)* days

57    notice of vessels expected date of re-delivery, and probable port.

58    5. Payment of said hire to be made  *as per Clause 30* ~~in New York in cash~~ in United States Currency, ~~semi-monthly~~ *15 days* in advance ~~and~~ for  the last ~~half months~~ *15 days* or

59    part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day By day, as it becomes

60    due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and Regular payment of the

61    hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62    terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~

63    ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

64    ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65    Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their agents, subject

66    to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67    of such advances.

68    6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or  place *or such  open roadstead anchorage, however if such anchorage place is not customary for same size of vessel, Owners  prior consent to be necessary* that Charterers or their Agents may

69    direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for similar size vessels to safely~~

70    ~~lie aground.~~ (See *Clause 109*)

71    7. That the whole reach of the Vessel's Hold, Decks, and *other* usual places of loading (not more than she can reasonably stow and carry), also

72    accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73  tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~

74  ~~paying Owners ............................... per day per passenger for accommodations and meals. However, it is agreed that in case any Fines or extra expenses are~~

75  ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~

76  8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with Ship's crew and

77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards Employment and

78  agency; and Charterers are to load, stow, ~~and~~ trim, *and discharge* the cargo at their expense under the supervision of the Captain, who, is to sign Bills of Lading for

79  cargo as presented, in *strict* conformity with Mate's ~~or Tally Clerk's~~ *receipts and without prejudice to this charter party.*

80  9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82  10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages Are prosecuted

83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84  rate of $10.00 *(United States Dollars ten only)* per day. ~~Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally~~ *(See Clause 76)*

85  Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualing.

86  11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in Writing, and the

87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, And furnish the Char-

88  terers, their Agents or Supercargo, when required, with a true copy of daily Logs, *in English language* showing the course of the vessel and distance run and the con-

89  sumption of fuel.

90  12. That the Captain shall use diligence in the *care, custody and* ~~caring for~~ the ventilation of the cargo.

91  13. ~~That the Charterers shall have the option of continuing this charter for a further period of ...............................................~~

92  ~~........................................................................................................................................................................................~~

93  ~~on giving written notice thereof to the Owners or their Agents................days previous to the expiration of the first-named term, or any declared option.~~

94  14. That if required by Charterers, time not to commence before*00:01 hours local time 1ˢᵗ January, 2017.....*and should vessel

95  not have *been delivered* ~~given written notice~~ of readiness on or before *24:00 hours local time 4ᵗʰ Janaury,2017* ~~but not later than 4 p.m. Charterers or~~

96  ~~their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.~~ *(See clause 34)*

97  15. That in the event of the loss of time from deficiency *and/or default* of crew or officer and/ or deficiency of men or stores, fire, breakdown or damages to hull, machinery or equipment, *unless such breakdown or damage caused by charterers and/or their servant and/ or their agents.*

98  grounding, detention by average accidents to ship or cargo, *or oil pollution only due to ships fault* drydocking for the purpose of examination or painting bottom, or by any other cause *not excepted in this charter party.*

99  preventing the full *use to charterers sailing and passage* ~~working~~ of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by

100  defect in or breakdown of any part of her hull, machinery or equipment, *unless such defect or breakdown caused by charterers and/ or their servants and/ or their agents* the time so lost, and the cost of any extra fuel   consumed in consequence

101  thereof, and all extra expenses shall be deducted from the hire.

102  16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and Accidents of the Seas,

104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually Excepted.

105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to Deviate for the

106  purpose of saving life and property. *(Also See Clause 62)*

107  17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to *two* ~~three~~ persons  *in London* ~~at New York,~~

108  ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them,~~ shall be *according to the London Arbitration rules and laws the decision being* final, and for

109  the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial *shipping* men. *This charter party shall be governed by and construed in accordance with English law*

110  18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this  Charter,  including General Aver-

111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

113 might have priority over the title and interest of the owners in the vessel.

114   19.That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

115 Crew's proportion. General Average shall be adjusted, stated and settled *in London*, according to ~~Rules 1 to 15, inclusive, 17 to~~

116 ~~22, inclusive, and Rule F of~~ York-Antwerp Rules *1994, or any subsequent amendments,* ~~1924, at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by these~~

117 ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~

118 ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign Currency shall be converted at~~

119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~

120 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~

121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special Charges thereon, shall, if~~

122 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposite Shall, at the option of the~~

123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a Special account at the~~

124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if Any, shall be paid in~~

125 ~~United States money.~~

126 ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause Whatsoever,~~

127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~

128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the Payment of any sacrifices,~~

129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges Incurred in respect of the~~

130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~

131 ~~ships belonged to strangers.~~ *New Jason clause as attached. Hire is not to contribute to general average.*

132 Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder

133 20. *Bunker* ~~Fuel~~ used by the vessel while off hire, *to be owners account* ~~also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the~~

134 ~~cost of replacing same, to be allowed by Owners.~~

135 21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter,~~ Vessel is to be ~~Docked at a~~

136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six Months, reckoning from~~

137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

138 ..............................................................................................................................................................................

139 ..............................................................................................................................................................................

140 22. Owners shall maintain the gear of the ship as fitted, providing gear (~~for all derricks~~) capable of handling lifts **as described** ~~up to   three tons,~~ also

141 providing ropes, falls, slings and blocks .If vessel is fitted with *cranes/grabs* ~~derricks~~ capable of handling heavier lifts, Owners are to provide necessary gear for

142 same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for

143 night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The

144 Charterers to have the use of any gear on board the vessel

145   23. Vessel to work night and day, if required by Charterers, *(See Clause 32)* and all ~~winches~~ *cranes/grabs* to be at Charterers' disposal during loading and discharging;

146 ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers engineers, winchmen,~~

147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~

148 ~~port, or labor unions, prevent crew from driving winches,~~ shore *crane men*  ~~Winchmen~~ to be paid By Charterers. ~~In~~  the  event of a  disabled ~~winch~~ *grab or grabs/ crane or cranes* or

149 insufficient power to operate ~~winches,~~ *cranes/grabs* Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time *and extra directly related expenses*  occasioned

150 thereby

151 24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained

152 in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels;

153 etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the Following clauses, both

154 of which are to be included in all bills of lading issued hereunder:

155                              U. S. A. Clause Paramount

156 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, Approved April~~

157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~

158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~

159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

160                        *New* Both-to-Blame Collision Clause  *as attached*

161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~

162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~

163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~

164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~

165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~

166 ~~owners as part of their claim against the carrying ship or her.~~

167 25. The vessel shall not be required to *force ice or follow ice breakers or to* enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-

168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of  ice to safely enter the

169 port or to get out after having completed loading or discharging.

170 26.Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the

171 navigation of the vessel, *seaworthiness and maintenance of the vessel, acts of pilots and tugboats except strike and/ or boycott  not directed against owners,* insurance, crew, and all other matters, same as when trading for their own account.

172 27. A commission of *1.25* ~~2 1/2~~ per cent ~~is payable by the Vessel and Owners to~~ *to Howe Robinson Partners Ltd to be deducted from hire payment*

173 .........

174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175 28.An address commission of ~~2 1/2~~ *3.75* per cent payable to *Charterers*..........on the hire earned and paid under this Charter.

*Additional clauses nos. 29  to 131, New  Both to Blame Collision Clause, New Jason Clauses, general clause Paramount , Bimco Standard Bunker Fuel Sulphur Content Clause, Bimco EU Cargoes  Declaration Clause For Time   Charter Parties, Bimco Piracy Clause For Time Charter Parties 2009, Bimco  Conwartime 2004 War Risk Clause,   International Group  Of P&I Clubs Financial  Security In Respect Of Pollution Clause,  Bimco Radioactivity Clause for Time Charter Parties, Bimco Standard Bunkering Quality And Liability Clause For Time Charter Parties, Bimco Bunkering Operations And Sampling  Clause  For Time Charter Parties As Attached Are Deemed To Form Part Of This Charter Party.*

*THE OWNERS:*                                      *THE CHARTERERS:*

*OCEANSTAR MARITIME CO.*                  *NORVIC SHIPPING NORTH AMERICA INC*

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER, 2016

**CLAUSE 29. BUNKERS ON DELIVERY / REDELIVERY**

Bunker on Delivery about 425/430 metric tons IFO plus about 55 metric tons LSMGO. Exact quantity to be confirmed upon delivery.

Owners confirm vessel has sufficient bunkers to safely reach at Singapore after completion of loading ops at loadport. Charterers to replenish bunkers during the voyage.

Prices USD 345 /500 for IFO/LSMGO at both ends

Bunker on redelivery about as on delivery for IFO and LSMGO. Any minor difference to be settled at same price upon redelivery.

Owners are allowed to replenish the vessel with about 400 metric tons IFO in Singapore after loading, simultaneously with Charterers bunkering operation, for owner's time and expenses. However Charterers to always have 1st right of bunker booking and bunkering operation .Any additional time arised due to owner's bunkering beyond Charterers bunkering shall be on owners account only.

**CLAUSE 30. PAYMENT OF HIRE (See Clause 79)**

Payment of hire shall be made by Charterers to the bank account as provided by the Owners in due time free of any bank charges to Owners, except those invoiced by Owners' bank and Owners' bank correspondent.

Evidence of receipt by Owners' bank shall constitute compliance of Charterers' obligation to pay hire in accordance with Clause 5, whether Owners are so notified by the bank or not.

Where there is any failure to make "punctual and regular payment" due to oversight, negligence or error or omission of Charterers or their Agents' employees or otherwise for any reason where there is absence of intention to fail to make payment as set out, Charterers shall be granted three (3) banking days grace to rectify the failure. Where so rectified the payment shall stand as "punctual and regular payment".

Owners bank details:

HSH NORDBANK AG
GERHART HAUPTMANN PLATZ 50
20095 HAMBURG GERMANY
Benificiary:      Oceanstar Maritime Co.
Account no:    REDACTED
IBAN             DE90 2105 0000 1100 3266 61
Swift Code      HSHNDEHH

**CLAUSE 31. NECESSARY DOCUMENTATION FOR EQUIPMENT**

With reference to Clause 15, it is agreed as follows;

Referring to line 97, the lack on board at any time of any necessary documentation attesting to the condition of all equipment and complying with regulations according to vessel's specifications shall be deemed a deficiency with any loss of time occasioned thereby to be treated as off-hire and any other expenses to be for Owners' account.
Referring to lines 97 and 99, the time lost for which hire shall cease (or be suspended) shall also include - inter alia.

From the time the vessel puts back to a port or departs from or interrupts the voyage or is withdrawn from the service of Charterers for drydocking, repairs or other Owners' purposes, until the vessel is again in the same position or at a point equivalent thereto.

6

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER, 2016

Losses of time due to delay to the vessel or interference with Charterers' use of the vessel by strikes, boycotts or secondary boycotts, manifestations or stoppages in any form on account of the vessel's flag, registry, ownership, manning or wages pattern.

## CLAUSE 32. VESSEL'S LIGHTING

With reference to Clause 23, it is agreed as follows:
Owners to arrange for the working of all time and necessary overtime / needed for the efficient operation of the vessel in all respects. Owners agree to provide sufficient lighting on board with ship's lights and light clusters to permit night work at all hatches at one and the same time / free of expense to the Charterers.

## CLAUSE 33. FLAG / CREW / I.T.F. AND ISM CLAUSE

Owners are normally using Turkish crew on their Owned vessels. The Owners of the vessel guarantee that the minimum terms and conditions of employment of the crew of the vessel are now or will be prior to presentation of the vessel for delivery and will remain for the period of this Charter Party covered by an I.T.F. agreement or a bona fide Trade Union Agreement acceptable to I.T.F.

In the event that the vessel is delayed by reason of boycotts, strikes, labour stoppages or other actions by the ITF against the vessel due to employment conditions, time so lost shall be considered as off-hire and costs directly resulting therefrom are to remain for Owners' account.

During the currency of this Charter Party the Owners shall procure that both the vessel and "The Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "The Company" to comply with the ISM Code shall be for the Owners' account.

## CLAUSE 34. NOTICES OF DELIVERY (LAY / CAN)

Owners shall give Charterers daily notice of delivery upon clean fixing.

LAYCAN: 1ST January 2017 0001 hours local time — 4TH January 2017, 2400 hours local time

## CLAUSE 35. NOTICES OF REDELIVERY

Charterers shall give owners not less than 10/7 days approximate notice of redelivery together with intended port/place of redelivery. This to be followed by 5/3/2/1 days definite notices of redelivery together with definite port/place of redelivery.

## CLAUSE 36. CHARTERERS' INSPECTION

Charterers to have the option of holding an inspection of the vessel at any time between delivery and redelivery, at their risk and expense subject to Owners approval which not to be unreasonably withheld. In all cases, Owners and Master to give every facility and assistance to carry out this inspection.

## CLAUSE 37. GRAIN LOADING

Vessel is suitable for carrying full cargoes of heavy grain and/or oilseeds and/or grain or oilseed products (provided within the scope of definition of "grains" in SOLAS 1994 Regulations) in bulk in all holds without requiring any shifting boards. For the carriage of grain and/or oilseeds in bulk, vessel to have on board at any time of this Time Charter period valid documents and certificates issued by vessel's Classification Society on the basis of the SOLAS 1974 Regulations. Vessel may load bulk grain / oilseeds and/or grain / oilseed products with two slack holds without any securing arrangements in accordance with approved Grain Loading Booklet, however oil seeds and its products listed in IMDG Code as 4.2 to be excluded.

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER, 2016

All cargoes to be loaded in accordance with IMO Regulations approved Grain Loading Booklet and to Master's satisfaction.

**CLAUSE 38. LOADING CONDITION**

Owners warrant the vessel can load a full cargo of iron ore to full deadweight capacity in alternate holds (No. 2 and 4 may be empty) as guided in the loading manual booklet. Owners further warrant the vessel can load coal, petcoke, anthracite or similar bulk cargoes to full deadweight and/or cubic capacity (whichever is the deciding factor) by spout loading and does not require any special trimming except required by I.M.O. BC Code. The vessel is a self trimming bulk carrier. Owners represent that the whole space of the vessel's holds and hatches is free from obstructions, available for cargo.

**CLAUSE 39. CARGO EXCLUSION**

Cargo exclusions, coal allowed only. All cargo to be loaded/transported/discharged according to IMSBC Code and IMO regulations.

**CLAUSE 40. AGENTS**

Charterers undertake to keep Owners informed during the periods as regards the itinerary of vessel and the name of their Agents at port of call. Owners may utilize the services of Agents appointed by the Charterers for Owners' minor matters and Charterers shall authorize their Agents to attend such request. Charterers shall settle such amount together with hire payments.
If fees are charged by Agents for handling husbandry matters same to be for Owners' account. Charterers have the right to withhold from Charter hire during the period of the Charter such amounts due to them for Owners disbursements, but maximum U.S. $500.00 per port with proper supporting statements to be sent to Owners promptly upon receipt of same from the relevant parties including agents. This also applied to cash advances to Master upon written instructions from Owners. Charterers to do best endeavour to settle this account as early as possible and Charterers to settle the account within 3 months after redelivery.

**CLAUSE 41. SEA WATER IN DOUBLE-BOTTOM**

Always subject to Master's discretion and vessel's construction Owners to permit sea water to be placed in any double - bottom tanks except fuel oil, diesel oil and fresh water tanks in order to press up to full capacity to give maximum stability.

**CLAUSE 42. TRADING EXCLUSIONS.**

One time charter trip via Indonesia to East Coast India - Bangladesh allowed only.

Vessel will not be ordered to transit seaways, sounds, channels where previously similar size of vessels have encountered grounding / collision due to incorrect or missing chart and hydrographical data before or during currency of this Charter Party.

Vessel is to trade within ports / berths / anchorages always afloat, always accessible for inbound/outbound transit.

Vessel will not be ordered to call any port / anchorage / place to load / discharge cargo where this size of vessels have not loaded/discharged before.

Vessel always to trade via safe port(s), safe berth (s), safer anchorage (s) always afloat, always accessible, always within International Navigating Limits.

The vessel shall not be required to force ice or follow ice breakers or enter any ice-bound port.

Vessel is not allowed to trade to the ports/areas where are prohibited from trading by the United Nations and/or international organizations of the United Nations.

NAABSA to apply.

NAABSA as per clause 6, except as such places where it is customary for similar size vessels to safely lay aground, and where

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER, 2016

the vessels rest on soft mud and vessel is not to be asked to manoeuvre whilst aground. Should vessel touch bottom, the charterers to arrange at their time and expense an underwater survey to assess the condition of hull prior to redelivery. Charterers indemnify owners against all damages, losses arising from damage to hull by vessel touching bottom during loading / discharging and consequential losses arising from damage to hull by vessel touching bottom during loading / discharging NAABSA allowed only 2 (two) times during this charter party.

**CONWARTIME 2004 Clause shall apply to this charter party.**

**CLAUSE 43. SUEZ AND PANAMA CANALS TONNAGE CERTIFICATES**

Throughout the period of the Charter vessel shall have on board current valid Suez and Panama Canals Tonnage Certificates and will so comply with all applicable requirements, regulations and recommendations so as to avoid any delay in transit of canals.

Any delay due to non-compliance or any lack of proper documentation or equipment according to vessel's specification is to be treated as off-hire and any expenses incurred thereby to be for Owners' account.

In the event that time is lost in Owners' obtaining any necessary licenses or permits or similar documents from any authority for Owners' own account, same shall be treated as off-hire and any extra expenses, including any related to inspection of the vessel or crew by any authority, shall be for Owners' account.

Time lost due to lack of licenses / permits / documents of vessel is for Owners' account, time lost due to lack of licenses / permits / documents of cargo is for Charterers' account.

**CLAUSE 44. CALLING AT U.S. PORTS**

It is understood that the vessel has full bunkering privileges at U.S. ports.

The vessel to have USCG Certificate of Financial Responsibility as necessary to comply with the Oil Pollution Act 1990 obligations or any subsequent amendments.

Vessel is not blacklisted by any country including U.S. Government to prevent trading.

**CLAUSE 45. WAR RISK INSURANCE**

Any additional war risk insurance premium over and above Owner's basic / normal war risk insurance premium for vessel and crew, if any, resulting from Charterers' trading of the vessel to be for the Charterers' account. War bonus to crew, if required to meet Charterer's trade, also to be for Charterers' account. The vessel shall not be required to proceed to a war risk area without Owners' prior consent at first, which will not be unreasonably withheld and unless insurance is available on payment of an additional premium and unless permitted by country of vessel's registry. The Conwartime 2004 as attached to be considered as part of this Time Charter Party.

**CLAUSE 46. BILLS OF LADING**

A) Charterers option to mention "freight prepaid" in bills of lading issued at loadport against payment of full hire of the estimated time charter period. Owners to be held fully indemnified against any responsibilities for bills of lading marked 'freight prepaid".

B) Charterers have the option to mention: notify, applicant + bank details, shipper s description of goods, lc number: xxxx dated xxx, h.s. code: xxdxx etc and other info pertaining to l/c and charterers/shippers/receivers trade requirements. subject to owner's approval.

C) Switch bills of lading wording : upon Charterers request, owners to issue switch and/or split and/or consolidated bills of

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER, 2016

lading in Singapore or any other place in Charterers option, through owners protective agents, against surrender/in exchange of first full set bills of lading issued at loadport together with Charterers simple and single letter of indemnity in owners P&I club format without any bank guarantee and signed by Charterers only. Prior to switching/splitting/consolidating 2nd set of bills of lading, Charterers to email the draft copy of new set of bills of lading for owners perusal and approval which not to be unreasonably withheld.

The bills of lading maybe split in smaller lots or consolidated and notify party name/shipper/consignee/l-c no, buyer's reference, place of issuance, h.s.code, etc may be changed or inserted, but the body of the bills of lading i.e. commodity/specs/quantity and quality of the cargo remaining same and owners not to be responsible for individual quantity, but the total amount. Charterers may also change "freight to be paid as charter party" to "freight prepaid" or vice-versa while switching and/or splitting and/or consolidating bills of lading.

At any point of time only one original sets of b/l(s) to be in circulation. Cost of switching and/or splitting and/or consolidating bills of lading to be on Charterers account.

In case original bills of lading are not available at disport, owners to discharge/deliver cargo against Charterers simple and single letter of indemnity in owners P&I club format/wording w/out any bank guarantee and signed by charterers only.

## CLAUSE 47. CARGO HOLD CLEANING

Crew to remove eventual dunnage on to vessel's deck providing regulations permit and in any case same always to be at Charterers' risk and expense. Crew to dispose of dunnage at sea when and where permitted. Charterers / Shippers to present the certificates of lashing / dunnaging / securing materials after completion of loading

Throughout the currency of this Charter Party, the Charterers shall remain responsible for all costs and time, including deviation, if any, associated with the removal and disposal of cargo related residues and/or hold washing water and/or chemicals and detergents and/or waste as defined by Marpol Annex V, Section 1 or other applicable rules relating to the disposal of such substances.

## CLAUSE 48. ARREST

Should the vessel be arrested during the currency of this Charter Party at the suit of any party having or purporting to have a claim against or any interest in the vessel, hire under this Charter Party shall not be payable in respect of any period during which the vessel is not fully at Charterers' disposal and any consequential expenses whatsoever shall be for Owners' account, unless such arrest is due to action against Charterers or sub-Charterers or their Agents or the Contractors or the cargo Shippers or Consignees.

## CLAUSE 49. LOG ABSTRACTS

Master is to forward promptly to Charterers completed log abstracts and port logs in English on the Charterers' forms as provided by the Charterers for both deck and engine for each voyages.

## CLAUSE 50. DRYDOCKING

No drydocking during Charter Party period except in case of emergency.

## CLAUSE 51. CARGO CLAIMS

Cargo claims shall be settled in accordance with the Inter Club New York Produce Exchange Agreement of September, 1996 and any subsequent amendments.

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER, 2016

**CLAUSE 52.** Deleted.

**CLAUSE 53. STEVEDORE DAMAGE**

Any damage caused by stevedores during the currency of this Charter Party shall be reported by the Master to the Charterers or their agents, in writing, within 24 hours of the occurrence except hidden damages which to be notified to Charterers upon discovery but latest before redelivery or as soon as possible thereafter but latest when the damage could have been discovered by the exercise of due diligence. The Master shall use his best efforts to obtain written acknowledgement by responsible parties causing damage unless damage should have been made good in the meantime.

Stevedore damage affecting seaworthiness or the proper working of the Vessel and/or her equipment, shall be repaired without delay to the Vessel after each occurrence in the Charterers' time and shall be paid for by the Charterers. Other repairs shall be done at the same time, but if this is not possible, same shall be repaired whilst Vessel is in drydock in the Owners' time, provided this does not interfere with the Owners' repair work, or by Vessel's crew at the Owners' convenience. All costs of such repairs shall be for the Charterers' account. Any time spent in repairing stevedore damage shall be for the Charterers' account.

The Charterers shall pay for stevedore damage whether or not payment has been made by stevedores to the Charterers.

**CLAUSE 54. INSURANCE FOR HULL AND MACHINERY**

Owners warrant that the vessel is covered by a reputable first class insurance for Hull and Machinery and shall remain fully insured throughout the terms of the Charter.

War value: USD 11 Million.

As long as the vessel is on hire to Charterers, Charterers to have the benefit of any return insurance premium receivable by Owners from their Underwriters (as and when received from Underwriters, but estimate amount deductible on redelivery) by reason of the vessel being in port for extended periods qualifying for such returns.

**CLAUSE 55. P. & I. CLUB**

Owners guarantee that the vessel is entered and shall remain entered in a Protection & Indemnity Association, which is a member of the Group of International P. & I. Clubs, for the duration of this Charter Party. Entry shall include, but not to be limited to, ordinary cover for cargo claims.

It shall be considered a fundamental breach by Owners if the vessel's P. & I. cover or class is cancelled or suspended during the currency of this Charter.

In the case of damage to and/or loss of cargo carried on the vessel in which Owners and/or Charterers' liability could be involved under the terms of this Charter Party, as the case may be, the Owners and/or the Charterers shall request and grant reasonable time extension for commencement of suit in each and every occurrence. Such extensions shall not prejudice the ultimate responsibility of both parties. Liability for cargo claims, as between Owners and Charterers, shall be apportioned as specified by the Interclub New York Produce Exchange Agreement effective from 1996, and its subsequent amendments.

If required by Charterers, and provided accepted by P. & I. club, Owners to authorize and instruct Owners' P. & I. Club to confirm directly to any party as ordered by Charterers that the vessel is fully covered for P. & I. and that collection of premiums are up to date. Owners' P. & I. Club: Gard

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER, 2016

## CLAUSE 56. ADDING OFF-HIRE TIME TO THE DURATION

Charterers have the option of adding any off-hire times except off-hire times caused by periodical drydocking to the duration of this Charter Party by giving Owners in writing at least two (2) months notice before redelivery. Charterers' notice shall confirm the approximate off-hire period to be added. The hire applicable to the off-hire time added to the duration of the Charter period to be at the level of the respective off-hire periods.

## CLAUSE 57. FINANCIAL RESPONSIBILITY IN RESPECT OF POLLUTION

If Owners are required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place or territorial or contiguous waters of any country or state in performance of this Charter Party, Owners shall meet such requirements at Owners' expense.

## CLAUSE 58. REDELIVERY CONDITIONS

Vessel is to be redelivered with all cargo holds clean-swept and washed down. Charterers to have the option to redeliver the vessel with cargo holds unclean, but paying a lumpsum of USD 5500 in lieu of hold cleaning including dunnage removal.

## CLAUSE 59. LAST HIRE PAYMENTS

Should the vessel be on her voyage to the port of redelivery at the time when payment of hire is due, said payment shall be made for such length of time as Owners or their Agents and Charterers or their Agents may agree upon as the established time necessary to complete the voyage. Bunkers to be taken over by the vessel and estimated disbursements for Owners' account before redelivery to be taken into account and when the vessel is redelivered any difference shall be refunded by Owners or paid by Charterers as the case may be. Charterers have the right to deduct from the last sufficient hire payments reasonably estimated Owners' disbursements and estimated bunkers remaining on board on redelivery.

## CLAUSE 60. TIME ZONE FOR HIRE PAYMENTS

Local time to apply for delivery time and G.M.T. for hire calculations.

## CLAUSE 61. CLAUSE PARAMOUNT AND OTHERS

Clause Paramount, New Both to Blame Collision Clause, New Jason Clause, Con wartime 2004, as attached hereto are to be considered part of this Time Charter Party and same are to be incorporated in the Bill(s) of Lading issued hereunder.

## CLAUSE 62. DEVIATION – Deleted

## CLAUSE 63. BUNKERS SPECIFICATIONS

Charterers to supply first class bunkers strictly complying with ISO 8217- 2005(E), enabling main engine and generator engines to operate without any harmful effects.

Bunker specs:
IFO GRADE 380 CST RMG 35 ISO 8217 - 2005(E)
MDO GRADE DMA/DMB ISO 8217 - 2005(E)

Owners are not to be responsible for possible under-performance and/or over-consumption caused by Charterers' supply of off-specs bunkers.

Charterers' option to supply RMF 25 instead of RMG 380 and DMA instead of DMB when the grades required are not commercially available in places such as South Africa/etc. but in case supplying RMF 25 / off specs bunkers Charterers to pay of the used bunker additive chemicals against Owners' invoices received from the supplier.

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER, 2016

In case bunkering in countries where they do not guarantee ISO 8217:2005, then ISO 8217:1996 to apply.

In case charterers supply low sulphur MGO (DMA) for trading to ECA + EU zones the viscosity to be minimum 2 CST at 40 degrees Celsius.

Bunker testing to be organized by Owners/managers but cost always to be for Charterers' account.

The Charterers shall supply bunkers of a quality suitable for burning in vessel's engines and auxiliaries and which conform to the specification(s) as set out in description clause 67. The Owners reserve their right to make a claim always within a maximum period of 14 days after bunkering against the Charterers for any damage to the main engines and auxiliaries caused by the use of unsuitable fuels of fuels not complying with the agreed specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the vessels engines of auxiliaries, the Owners shall not be held responsible for any reduction in the vessel's speed performance and/or increased bunker consumption, nor for any time lost and any other consequences.

**CLAUSE 64. Deleted.**

**CLAUSE 65. SLOW STEAM**

Charterers have option to slow steam vessel at any time during the course of the Charter Party on the basis of speeds and consumptions which to be advised, but always within a range of safe, operable and harmless to the engine, always subject to Masters' discretion, weather permitting and vessel's engine makers' recommendations.

**CLAUSE 66. COMPLIANCE WITH INTERNATIONAL CONVENTION**

In the event of the vessel being prevented from or unable to perform in accordance with the terms of this Charter Party by reason of :
Action on the part of relevant authorities resulting from non-compliance with any compulsory applicable enactments enforcing all or part of any of the International Convention in force.
Labour stoppages in services essential to the operation of the vessel owing to her flag or ownership or management or the conditions of employment on board.

Any loss of time in the event a) and/or b) shall result in the vessel being off-hire and shall be dealt with in accordance with the off-hire clause.

It is understood that, if necessary, vessel will comply with any safety regulations and/or requirements in effect at ports of loading and/or discharging. Although other provisions of this Charter make it the responsibility of the Owners, it is agreed that should the vessel not meet safely rules and regulation Owners will make immediate corrective measures and any stevedore standby time and other expenses involved including off hire will be for Owners' account.

Vessel to be delivered with valid deratisation certificate on board and same to remain valid throughout the currency of this Charter Party.

**CLAUSE 67. VESSEL DESCRIPTION**

RE: MV YASA AYSEN
55.905 MTDWT ON 12.57 M DRFT
189.99M LOA/32.26M BEAM/182M LBP
DEPTH MOULDED 17.90M
SINGLE DECK/BULK CARRIERS/SELF TRIMMING
BLT MAR/2007 MITSUI-JAPAN/MARSHALL ISLANDS FLAG
INT GRT/NRT 31.255/18.504
TPC ABT 56

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER, 2016

CO2 FITTED IN HOLDS
CLASS NK
PANDI GARD SA
5 HO/HA
ABT GRAIN 70,810.7 CBM/BALE 68,083.5 CBM
CARGO HOLDS (CBM) (INCLUDING HATCHCOAMING)GRAIN   BALE
NO 1    12,713.5  12,132.0
NO 2              14,709.8  14,090.0
NO 3              14,652.0  14,050.7
NO 4              14,709.8  14,090.0
NO 5      14,025.6  13,720.8
-----------------------------------------------------------
TOTAL  (CBM)                 70,810.7  68,083.5

HATCH DIMS (L X B)
NO 1 17.60 X 18.92 M
NO 2/3/4/5 21.12 X 18.92 M

HOLD DIMS (FWD/AFT BULKHEAD X L)
NO 1 : 8.0 / 23.6 X 28.85 M
NO 2/3/4 : 23.6 / 23.6 X 28.80 M
NO 5 : 23.6 / 10.63 X 28.20 M

HA CVRS MAC GREGOR, CYLINDER FOLDING TYPE, ELECTRO-HYDRAULIC DRIVEN

MITSUI M.A.N. - B AND W 6S50MCC TYPE

4 X 30 MT ELECTRO-HYDRAULIC CRANES, IHI 4 X 13 CBM (14.50 MTONS PAYLOAD) (ADJUSTABLE CAPACITY)
SMAG-PEINER ELECTRO-HYDRAULIC GRABS

CRANE OUTREACH: 9.87M

ALL SPEED/CONSUMPTION FIGURES ARE TO BE CONSIDERED AS ABOUT (+/- 0.5KNOT FOR SPEED AND +/- 5%
FOR CONSUMPTION) ARE ALWAYS SUBJECT TO GOOD WEATHER WHICH IS DEFINED AS NO ADVERSE
CURRENT A/O NEGATIVE INFLUENCE OF SWELL A/O MODERATE SEA, WIND NOT EXCEEDING BEAUFORT
FORCE 4 (FOUR) A/O DOUGLES SEA STATE 3 (THREE). PERIODS OF WEATHER EXCEEDING THE ABOVE
DESCRIBED GOOD WEATHER CONDITIONS ARE TO BE EXPRESSELY EXCLUDED FROM THE EVALUATION OF
VESSELS PERFORMANCE.
NO EXTRAPOLATIONS TO BE MADE FOR WEATHER/SEA CONDITIONS OTHER THAN THOSE DESCRIBED
ABOVE.

CHARTERERS TO SUPPLY FIRST CLASS QUALITY BUNKERS STRICTLY COMPLYING WITH ISO 8217-2005(E),
ENABLING MAIN ENGINE AND GENERATOR ENGINES TO OPERATE WITHOUT ANY HARMFULL EFFECTS.

BUNKER SPECS :
IFO GRADE 380 CST RMG 35 ISO 8217- 2005(E)
MDO GRADE DMA/DMB ISO 8217 - 2005(E)

IN CASE CHARTERERS SUPPLY LOW SULPHUR MGO (DMA) FOR TRADING TO ECA + EU ZONES THE
VISCOSITY TO BE MINIMUM 2 CST AT 40 DEGREES CELCIUS.

BUNKER TESTING TO BE ORGANIZED BY OWNERS/MANAGERS BUT COST ALWAYS TO BE FOR CHRTS
ACCOUNT.

**SPEED (KNOTS) CONSUMPTION(T/DAY)**

SPEED (KNOTS) CONSUMPTION(T/DAY)
**IN LADEN   AT FULL SUMMER DRAFT (12.57 M)**

12      23 MT IFO + 0,2 MT MDO (ECO/WOG M/E MIN 100 RPM)

14

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER, 2016

12.5    25 MT IFO + 0,2 MT MDO (ECO/WOG M/E MIN 100 RPM)
13      27 MT IFO + 0,2 MT MDO
13.5    29 MT IFO + 0,2 MT MDO


IN BALLAST

12.5    23 MT IFO + 0,2 MT MDO (ECO/WOG M/E MIN 100 RPM)
13      25 MT IFO + 0,2 MT MDO (ECO/WOG M/E MIN 100 RPM)
13.5    27 MT IFsO + 0,2 MT MDO


GENERATOR CONSUMPTION (T/DAY)

AT PORT WORKING/IDLE : 4,5/1,5 MT IFO + 0,2 MT MDO

M/E MAY CONSUME MDO DURING MANOEUVERS, DURING NAVIGATION IN CONFINED RESTRICTED WATERS ETC

BOILER (ONLY AT PORT - T/DAY IFO) 1 TON/DAY


ALL DETAILS ARE ABOUT


PLEASE ADVICE FULL TC DESC INCLUDING ECO SPEED/CONSUMPTION - SEE ATTACHED

CHARTERERS TO ONLY SUPPLY 8217:2005 BUNKER SPECS WITH RMG 380 CST ONLY. – CONFIRM

CHARTERERS OPTION TO TRADE THE VESSEL AT ECO SPEED/ CONSUMPTION.- AS PER ATTACHMENT

CHARTERERS WARRANTIES AND QUESTIONNAIRE TO BE DULY FILLED & INCORPORATED –AS SENT BY OWNERS YESTERDAY

ACCOUNT: NORVIC SHIPPING NORTH AMERICA INC, TORONTO
www.norvicshipping.com.


## CLAUSE 68. VESSEL'S DESCRIPTION (2)

Description of the vessel as per Clause 67 is mutually agreed to be continuing warranties for the duration of this Time Charter Party.

Owners guarantee that at the time the Vessel is placed at Charterers' disposal, the Vessel shall fulfil the descriptions, particulars and capabilities set forth in this Charter, and shall be tight, staunch and strong, in thoroughly efficient order and condition and in every way fit, manned, equipped and supplied for the service contemplated. Such description, particulars, capabilities and condition of the Vessel to be maintained by Owners throughout the period of the Vessel's service hereunder, perils of the sea excepted.

## CLAUSE 69. PILOTS AND HOLD LADDERS

Vessel to be equipped with pilots and hold ladders in accordance with Australian regulations.

## CLAUSE 70. WAR CANCELLATION

If war breaks out between any two or more of the following countries;

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER, 2016

In the event of any warlike operation involving vessel's flag country, USA, U.K., Russia, The Republic of China, India, France, Japan directly affecting vessel's trading under this Charter Party, both parties shall mutually discuss as to cancel or continue this Charter Party.

**CLAUSE 71.** Deleted

**CLAUSE 72. SMUGGLING**

Any delay, expenses and/or fines incurred on account of smuggling to be for Charterers' account, if caused by Charterers and/or persons appointed by Charterers, and to be for Owners' account if caused by Owners, Officers and/or crew and/or persons appointed by Owners.

**CLAUSE 73.** Deleted

**CLAUSE 74. RELEASE OF CARGO WITHOUT BILL OF LADING**

Charterers' Bills of Lading or Standard BIMCO Seaway Bills to be used if required by Charterers.

Charterers and/or their agents have the option to sign Bills of Lading on behalf of the Master in strict conformity with the mate's receipts without prejudice to this charter party.
Neither the Charterers nor their agents shall permit the issue of any Bill of lading, way bill or other document evidencing a contract of carriage (whether or not signed) on behalf of the Owners or on the Charterers' behalf or on behalf of any Sub-Charterers incorporating where not compulsorily applicable the Hamburg Rules or any Legislation imposing liabilities in excess of Hague/Visby Rules. Charterers shall indemnify Owners against any liabilities, loss or damage which may result from any breach of the provisions of this clause. No through or liner Bill of Lading to be issued.

In case Original Bill(s) of Lading are not available at discharge port, Owners to discharge/deliver cargo against Charterers simple and single Letter of Indemnity in Owners P&I club format/wording w/out any bank guarantee and signed by Charterers only.

Should Charterers require vessel to change discharging port after Bill of Lading have been issued Owners to comply with such instructions upon receipt of a faxed copy of a single Letter of Indemnity signed by Charterers only and issued in conformity with Owners' standard P&I Club form.

Charterers hereby warrant that they will take all necessary steps to comply in all respects with U.S. customs requirements requiring a unique bill of lading identifier on all waybills, Seaway bills, cargo manifests and Bill of Lading.

Seaway Bills for Japanese companies only to apply. (See Clause 122)

**CLAUSE 75. COMMUNICATION WITH CREW**

The Master, Chief Engineer and all deck Officers, including the bosun are to be able to speak and understand English.

**CLAUSE 76. CABLE / VICTUALLING / ENTERTAINMENT**

Charterers to pay a lumpsum of USD 1,500 per 30 days pro-rata to cover communications, victualling and entertainments expenses.

**CLAUSE 77. SHIP TO SHIP TRANSFER CLAUSE FOR TIME CHARTER PARTIES**

(a)     The Charterers shall have the right to order the vessel to conduct ship to ship cargo operations, including the use of floating cranes and barges. All such ship to ship transfers shall be at the Charterers' risk, cost, expense and time.

16

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER, 2016

(b)    The Charterers shall direct the vessel to a safe area for the conduct of such ship to ship operations where the vessel can safely proceed to, lie and depart from, always afloat, but always subject to the Master's approval. The Charterers shall provide adequate fendering, securing and mooring equipment, and hoses and/or other equipment, as necessary for these operations, to the satisfaction of the Master.

(c)    The Charterers shall obtain any and all relevant permissions from proper authorities to perform ship to ship operations and such operations shall be carried out in conformity with best industry practice.

(d)    If, at any time, the Master considers that the operations are, or may become, unsafe, he may order them to be suspended or discontinued. In either event the Master shall have the right to order the other vessel away from the vessel or to remove the vessel.

(e)    If the Owners are required to extend their existing insurance policies to cover ship to ship operations or incur any other additional cost / expense, the Charterers shall reimburse the Owners for any additional premium or cost / expense incurred.

(f)    The Charterers shall indemnify the Owners against any and all consequences arising out of the ship to ship operations including but not limited to damage to the vessel and other costs and expenses incurred as a result of such damage, including any loss of hire; damage to or claims arising from other alongside vessels, equipment, floating cranes or barges; loss of or damage to cargo; and pollution.

## CLAUSE 78. U.S. SEA CARRIER INITIATIVE AGREEMENT (SCIA)

The Owners certify that they have entered in and signed with the U.S. Customs the SCIA on an individual basis or through an Association such as BIMCO, otherwise they warrant to take the necessary steps before vessel's delivery and to hold the Charterers harmless through the whole duration of the charter against any claim from U.S. Customs in respect of drugs which could be found on board.

However Charterers are liable to undertake the consequence if the cargo carried contained any drugs and/or drug-like products found on board, or the drugs and/or drug-like products to be placed on board the vessel by Charterers and/or Charterers' servants without the knowledge of vessel's Owners, Manager or Master.

## CLAUSE 79. RATES OF HIRE

Hire USD 5000 per day pro-rata including overtime payable every 15 days in advance.

First hire to be paid to Owners nominated bank within 3 Canada banking days after vessel's delivery and upon receipt of hire invoice from Owners by email or fax.

Charterers are entitled to deduct estimated Owners expenses (maximum USD 500 at each port of call) from last sufficient hire payment.

Charterers not to pay any bunker value

## CLAUSE 80. TAX CLAUSE

All taxes and/or dues on the vessel and/or cargo and freight arising out of cargoes carried or ports visited under this Charter Party shall be for Charterers' account.

## CLAUSE 81. SURVEY CLAUSE

Charterers to appoint a mutually agreed independent surveyor for performing a joint on-and off- hire bunker survey. Joint on-hire bunker survey to be in Owners' time and joint off-hire bunker survey to be in Charterers' time. Expenses to be shared equally.

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER, 2016

## CLAUSE 82. U.S. TRADE - UNIQUE BILL OF LADING IDENTIFIER CLAUSE

The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America or shall have been endorsed with a unique Bill of Lading identifier as required by the U.S. Customs Regulations including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Noncompliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account.

## CLAUSE 83. DRUGS

In the event that prohibited drugs are found in cargo, equipment or other property loaded by Charterers, their servants or Agents, or are found on the person or in possession of or effects of Charterers, servants or Agents, Charterers shall remain responsible for all and any consequential fines and expenses including the detention of the ship. The ship shall not go off-hire as a result of the presence of the drugs, whether this be real or suspected unless such delay or detention is directly attributed to the Owners, Master or crew.

## CLAUSE 84. PARAMOUNT CLAUSE IN BILLS OF LADING

The Charterers are obliged to ensure that any Bill of Lading to be used in respect of the voyage(s) contemplated and submitted to Master or to Agent(s) authorized to sign on Master's behalf contains whichever of the Paramount clauses set out hereunder is appropriate to the voyage(s) and to indemnify the Owners hereto in respect of all losses, costs and expenses resulting from failure to do so.

Either Customary / General Paramount clause referring to Hague Rules and to Hague / Visby Rules if compulsorily applicable.

Or only when carriage is to and/or from a state which is a contracting party to the Hamburg rules following provisions will apply:

This Bill of Lading shall have effect subject to any national law making the International Convention for the Unification of certain rules of Law relating to Bill(s) of Lading signed at Brussels on 25th August 1924 (the Hague rules) or the Hague rules as amended by the Protocol signed at Brussels on 23rd February, 1968 (the Hague / Visby rules) compulsorily applicable to this Bill of Lading. If any terms of this Bill of Lading be repugnant to that legislation to any extent, such terms shall be void to that extent but not further. Neither the Hague rules nor the Hague / Visby rules shall apply to this contract where the goods carried hereunder consist of live animals or cargo which by this contract is stated as being carried on deck and is so carried.

Save where the Hague or Hague / Visby rules apply by reason of a) above, this Bill of Lading shall take effect subject to any national Law in force at the port of shipment or place of issue of the Bill of Lading making the United Nations Convention of the Carriage of the Goods by Sea 1978 (The Hamburg Rules) compulsorily applicable to this Bill of Lading in which case this Bill of Lading shall have effect subject to the Hamburg rules which shall nullify any stipulation derogating therefrom to the detriment of the shipper or consignee.

Where the Hague / Visby or Hamburg rules are not compulsorily applicable to this Bill of Lading the carrier shall be entitled to the benefits of all privileges, rights and immunities contained in Articles 1 to VIII of the Hague, save that the limitation sum for the purposes of Article rule 5 of the Hague rules shall be GBP 100.

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER, 2016

## CLAUSE 85. GRAB DISCHARGE CLAUSE

Vessel is guaranteed suitable for grab discharge. No cargo to be loaded in any place not suitable for shore unloader discharge by means of mechanical grabs.

## CLAUSE 86. DEVIATION DUE TO ACCIDENT/BREAKDOWN

Should the vessel be put into any port other than those instructed by the Charterers by reason of accident or breakdown or for the purpose of landing any injured or sick Officer, including Master, or members of the crew, the port charges, pilotages and any other expenses including bunkers and loss of time shall be borne by Owners also should the vessel be put back whilst on voyage by way of the above mentioned reasons, the hire shall be suspended from the time of her putting back until she is again in the same or equidistant position from the destination and the voyage resumed therefrom.

## CLAUSE 87. VACCINATION

Owners to arrange at their expense that the Master, Officer and crew of the vessel hold valid vaccination certificates against cholera and yellow fever and smallpox if and where required throughout Time Charter period.

Owners to comply for their account with all sanitary regulations at ports of call including water treatment of cholera where required.

## CLAUSE 88. GANGWAY/WATCHMEN

If ordered by the vessel for the Owners' account. If however shore gangway / watchmen are compulsory by port or local regulations, then cost to be for Charterers' account.

## CLAUSE 89. CARGO MONITORING

The vessel will be required to carry on board appropriate instruments for measuring concentrations of methane, oxygen and carbon monoxide, the PH value of hold bilge water sample and cargo temperature in the range of 0-100 degrees Centigrade without requiring entry into cargo space.

## CLAUSE 90. Deleted

## CLAUSE 91. STOWAWAYS CLAUSE FOR TIME CHARTER PARTIES 2009

(a)   If stowaways have gained access to the vessel by means of secreting away in the goods and/or containers or by any other means related to the cargo operation, this shall amount to breach of Charter. The Charterers shall be liable for the consequences of such breach and hold the Owners harmless and keep them indemnified against all claims; costs (including but not limited to victualling costs for stowaways whilst on board and repatriation); losses; and fines or penalties, which may arise and be made against them. The Charterers shall, if required, place the owners in funds to put up bail or other security. The vessel shall remain on hire for any time lost as a result of such breach.

(b)   Save for those stowaways referred to in sub-clause (a), if stowaways have gained access to the vessel, all expenses, including fines or penalties, shall be for the owners' account and the vessel shall be off hire for any time lost.

## CLAUSE 92. WEATHER BUREAU

Vessel's speed and consumption performance analysis will be carried out by Charterers for each voyage on an average ( ballast + laden) basis after the end of each voyage for steaming periods (from pilot station to pilot station excluding manoeuvring steaming in confined waters / canals) under good weather and current conditions only as per vessel's description.

Single days of voyages will not be analysed separately and will not be construed a basis for performance.

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER, 2016

Charterers will not withhold any hire payment partially or wholly due to alleged under performance or over consumption during the course of the Charter period unless amount has been agreed by Owners.

Evidence of weather conditions shall be taken from vessels deck logs and independent weather bureau reports. In the event of consistent discrepancy between deck logs and independent weather bureau reports appointed by Charterers, then Owners and Charterers to jointly to appoint another independent weather bureau company and the result of 2 independent weather bureau company reports to be binding for both parties.

## CLAUSE 93. BULLDOZERS ETC.

Forklift trucks / bulldozers / grabs / magnets etc., shall be allowed to be used in the holds if necessary, provided always within the vessel's permissible load.

## CLAUSE 94. WARRANTIES

Owners warrant that the vessel is not blacklisted by Arab countries nor anywhere else within the agreed trading limits, has not traded Cuba for the last 180 days, and Israel. is eligible for bunkers In The United States of America, its territories and possessions, in accordance with directives from The United States Department of Commerce, Office of International Trade.

## CLAUSE 95. WEATHERTIGHT HATCHES

The Owners warrant that on vessel's delivery and throughout the currency of this Charter the vessel's hatch covers are weather tight. All hatches are to be carefully attended by the Crew to prevent leakage. The Charterers have the option to perform hose / pressure / ultrasonic or similar tests on all hatches at any time during Charter Party.

## CLAUSE 96. LIEN

In the event that Charterers have a contractual or statutory right of lien over cargo carried on board for hire, freight, deadfreight or demurrage Owners shall co-operate with Charterers in exercising a lien over the cargo and shall retain possession of the cargo on their behalf and deal with the cargo on Charterers' instructions. This is to be carried out in Charterers' time and at Charterers' risk. Charterers to fully indemnify Owners for any consequences by carrying out Charterers' instructions.

## CLAUSE 97. Deleted

## CLAUSE 98. CHANGE IN APPLICABLE LAWS AND REGULATIONS

If the following circumstance affects the performance by Owners of this Charter, Charterers and Owners shall discuss the situation in good faith to settle down the problem:

When the existing Laws and regulations which apply to this Charter contract have been changed or revised by the relevant authorities during the currency of this Charter;

When any Laws and regulations have come into force during the currency of this Charter;

(Above will not be applicable for the vessel's technical specifications.)

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER, 2016

**CLAUSE 99. ADDITIONAL FITTINGS - Deleted**

**CLAUSE 100. CREW SERVICE**

With reference to Clause 8 of this Charter Party "customary assistance" shall include but not be limited to;
All opening and closing of hatches, when and where required.

Raising and lowering of derricks and rigging cranes, if fitted, and/or gangways in preparation for loading and discharging.
Shaping up vessel's holds/hatches and cranes, if fitted, as much as possible prior arrival at loading and/or discharging places
so as to immediately commence loading and/or discharging operations.

Warping alongside dock.

The above services shall be considered as a minimum and shall in no way be construed as an alternative to or reduction in
the standard of services from Officers and crew required under this Charter Party. Above services is subject to local / port
regulations.

**CLAUSE 101. Deleted**

**CLAUSE 102. LOADING OF STEEL**

Steel cargoes to be sufficiently dunnaged / lashed / secured and unlashed / unsecured at Charterers' expense, risk and in
their time by stevedores under the supervision of the Master and up to his satisfaction. Removal of dunnaging materials in
all discharge ports to be for Charterers' account.

Vessel can load / stow / carry / discharge maximum 2 tiers of each maximum 15 tonnes unit weight steel coils, as stipulated
in vessel's steel coil loading plan.

Charterers / Shippers are provide to Master prior sailing from load port (s) "fumigation certificate" for dunnaging / securing
/ lashing materials"

Both Owners and Charterers have the option to arrange for a pre-loading survey of the cargo. Expenses incurred for such
a survey to be shared equally by both parties. In case the vessel is sublet to other Charterers, the cost to be split
proportionately by all the concerned parties.

**CLAUSE 103. Deleted**

**CLAUSE 104. Deleted**

**CLAUSE 105. CRANE DRIVERS**

Charterers have the option to arrange crane drivers for loading or discharging operations who will stay onboard the vessel which
will provide suitable resting / sleeping area as far as vessel's accommodations are available. Charterers to pay USD 10 per crane
driver per day to Owners covering suitable accommodation onboard and providing suitable meals.

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER. 2016

**CLAUSE 106. STEEL PRODUCTS** - Deleted

CLAUSE 107. **Deleted**

**CLAUSE 108. LMAA ARBITRATION**
BIMCO Dispute Resolution Clause English Law, London
Arbitration

(A) This contract shall be governed by and construed in accordance with English Law and any dispute arising out of or in connection with this contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The Arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) terms current at the time when the arbitration proceedings are commenced. The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of such appointment in writing to the other party its arbitrators as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it is done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advice the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing, to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 100,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA small claims procedure current at the time when the arbitration proceedings are commenced.

(B) Notwithstanding the above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this contract.
In the case of a dispute in respect of which arbitration has been commenced under the above, the following shall apply: -

(I) Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "mediation notice") Calling on the other party to agree to mediation.
(II) The other party shall thereupon within 14 calendar days of receipt of the mediation notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the arbitration tribunal ("the tribunal") or such person as the tribunal may designate for that purposes, The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may set by the mediator.

(III) If the other party does not agree to mediate, that fact maybe be brought to the attention of the tribunal and may be take into account by the tribunal when allocating the costs of the arbitration as between the parties.

(IV) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER. 2016

(V)Either party may advise the tribunal that they have agreed on to mediation. The arbitration procedure shall continue during the conduct of the mediation but the tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

(VI)Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

(VII)The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.

(note: the parties should be aware that the mediation process may not necessarily interrupt time limits.)

## CLAUSE 109. CAN ALSO BE ADDED TO TRADING EXCLUSION

NAABSA as per NYPE Clause 6 is allowed in Argentina, Brazil, Buenaventura, Colombia and Sauda (Norway). Maximum 2 (two) NAABSA voyage allowed during the currency of the Charter Party with respect to other ports / berths not named within this clause, Charterers are to inform and satisfy Owners in advance of intended port / berth where NAABSA is customarily performed by similar size ships.

Owners' approval of Charterers request not to be unreasonably withheld.

Charterers' option to break International Navigating Limits but always subject to Owners' underwriter advance approval,

and Charterers to pay Owners extra insurance premium as per voucher from Owners' underwriters. At no time is the vessel to be required to force ice or follow icebreakers without Owners' prior approval.
"NAABSA as per Clause 6, except at such places where it is customary for similar size vessels to safely lay aground and where the vessels rest on soft mud and vessel is not to be asked to manoeuver whilst aground. Should vessel touch bottom, the Charterers to arrange at their time and expense an underwater survey to assess the condition of hull prior to redelivery. Charterers indemnify Owners against all damages, losses and consequential losses arising from damage to hull by vessel touching bottom during loading/discharging. NAABSA allowed only 2 times during this Charter Party. "

## CLAUSE 110. Deleted.

## CLAUSE 111. Deleted.

## CLAUSE 112. BALLASTING / DE-BALLASTING CLAUSE

a) Charterers to allow Master, to take heavy ballast to the vessel at his discretion by flooding cargo hold at clean sea waters and by stopping the vessel as the ballast exchange manual does not permit heavy ballasting under way.

b) It will take about 20 hours to de-ballast the vessel (in normal ballast condition) during speedy cargo loading in areas like South Africa, Australia etc.

## CLAUSE 113. SEALING OF HATCHES

If required by Charterers, crew to seal vessels hatches with ram neck tape or foam. Ramneck tape or foam in that case to be provided by and paid for by Charterers. During the sealing of hatches vessel to remain on hire.

## CLAUSE 114. BOTTOM FOULING

In the event that the vessels' speed capacity is reduced as a result of marine growth on the vessels' bottom by reason of the vessel being in a port or place for a period in excess of 26 days the Owners shall not be responsible for reduction of speed

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER. 2016

or increase of bunker consumption of the vessel up until such time as her next schedule dry dock or a bottom cleaning arranged by the Charterers at their time, risk and expenses to the Owners' satisfaction, whichever is earlier. Even if bottom cleaning is arranged, Owners/vessel do not guarantee to perform as warranted charter- party speed and consumption figures. In case charterers are unable to arrange the inspection and cleaning, then charterers option to pay Usd 17500 lumpsum cost towards this clause and expenses herein.

## CLAUSE 115. ISPS / MTSA CLAUSE FOR TIME CHARTER PARTIES 2005

(a) (i) The Owners shall comply with the requirements of the International Code for the
Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company" / "Owner" to comply with the requirements of the ISPS Code / MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.
(b) (i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code / MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code / MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

Footnote: This Clause replaces previously published ISPS Clause for Time Charter Parties AND the US Security Clause for Time Charter Parties, both of which are now officially withdrawn

## CLAUSE 116. NORTH AMERICAN ADVANCE CARGO NOTIFICATION CLAUSE FOR TIME CHARTER PARTIES

(a)  If the Vessel loads or carries cargo destined for the US or Canada or passing through
US or Canadian ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or the

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER. 2016

Canada Border Services Agency regulations (Memorandum D3-5-2) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

(i)     Have in place a SCAC (Standard Carrier Alpha Code)/Canadian Customs Carrier Code;

(ii)    For US trade, have in place an ICB (International Carrier Bond);

(iii)   Provide the Owners with a timely confirmation of (i) and (ii) above as appropriate; and

(iv)    Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs or by ACI (Automated Commercial Information) to the Canadian customs, and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, Law or regulation.

**CLAUSE 117.**

Vessel has no relation to ex-Yugoslavia in vessel's flag / ownership / crew etc.

**CLAUSE 118. ITF / BOYCOTT**

Owners warrant that the vessel's crew is and will be during the period of this Charter Party employed under a bona fide union agreement, the standard of which is fully acceptable to the I.T.F. and unions in all countries not excluded in this Charter Party.

In the event of the vessel being denied or restricted in the use of port and/or loading and/or discharging facilities or shore labour and/or tug or pilotage assistance or of any other restriction, detention or any loss of time whatsoever due to boycott or arrest of the vessel or due to government restrictions, all caused by the vessel and/or by reason of the terms and conditions on which members of the crew are employed or by reason of any trading of this or any other vessel under same Ownership or operation or control, the payment of hire shall cease for the time thereby lost and all extra directly related expenses incurred due to above are to be for Owners' account and may be deducted from hire. Owners are also responsible for any valid claim that may be presented by third party.

**CLAUSE 119. CRANES / GRABS**

Charterers to have free use of vessel's cranes / grabs. Owners confirm cranes and grabs are in good working condition. In case of breakdown of vessels' cranes / grabs, Charterers' option to hire shore cranes / grabs for Owners' account. Charterer shall have the use of any cargo gear / grabs on board the vessel if required by charterer, the vessel shall work night and day and all cargo handling gear shall be at Charterers' disposal during loading and discharging. All cargo handling gear including derricks, cranes, winches and grabs, if fitted, shall be kept in good working order with the cranes capable of lifting upto vessel's description and the vessel shall provide sufficient power to drive them, free of expense to Charterer. In the event of a deficiency for any period affecting any of these or any other equipment, including but not limited to the vessel's hatchcovers and the vessel's ability to ballast and deballast as required for the loading and discharging operations, hire shall be suspended

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER. 2016

or reduced pro-rata to the number of hatches affected depending on the deficiency. All expenses including but not limited to cost of standby of trucks, labour and mechanical equipment or removal of the vessel from the berth to be for Owners' account. In the event of cargo handling gear deficiency, Charterer has the right to continue working the vessel by using shore equipment, in which event the vessel shall remain on hire. However, Owner shall reimburse Charterer (by deduction from hire) for all extra costs incurred and properly substantiated, which arise as a consequence of using shore equipment.

Furthermore, any time lost due to inefficiencies in working the vessel with shore equipment shall be deducted from the hire on a pro rata basis. Without prejudice, if the vessel is moved off the berth due to a deficiency in the cargo handling gear, the vessel shall remain off-hire until the deficiency has been remedied and the vessel is in the same position, as if there had been no deficiency originally.

Furthermore, the vessel shall be off-hire for any time lost by reason of berth congestion or the like that would not have been lost but for the deficiency of the cargo handling gear.

The vessel's cargo gear and all other equipment shall comply with reasonable regulations and/or requirements in effect at port or ports of call and canals and countries in which the vessel will be employed for regular non-fluid bulk cargoes like coal and iron ore. Any additional or specialized equipment needed for load and discharge despite Charterers being aware what is on board shall be entirely for Charterers' account

**CLAUSE 120.**

BIMCO radioactivity risk clause for time charter parties, BIMCO standard bunkering quality and liability clause, BIMCO bunkering operations and sampling clause for time charter parties, BIMCO sanctions clause for time charter parties, ISPS/MTSA clause for time charter parties, BIMCO Ice clause for time charter parties, BIMCO EU cargo declaration clause for time charter parties, BIMCO Piracy clause for time charter parties 2009, North American Advance Cargo Notification clause for time charter parties, BIMCO CONWARTIME 2004 WAR RISK clause, International group of P&I Clubs financial security in respect of pollution clause all to form part of the charter party and to be deemed incorporated in all the bill(s) of lading issued under this charter party.

**CLAUSE 121. BIMCO ICE CLAUSE FOR TIME CHARTER PARTIES**

a) The Vessel shall not be obliged to force ice but, subject to the Owners' prior approval which shall not be unreasonable withheld having due regard to its size, construction and class, may follow ice-breakers.

b) The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area where lights, lightships, markers or buoys have been or are about to be withdrawn by reason of ice, nor where on account of ice there is, in the Master's sole discretion, a risk that, in the ordinary course of events, the Vessel will not be able safely to enter and remain at the port or area or to depart after completion of loading or discharging. If, on account of ice, the Master in his sole discretion considers it unsafe to proceed to, enter or remain at the place of loading or discharging for fear of the Vessel being frozen in and/or damaged, he shall be at liberty to sail to the nearest ice-free and safe place and there await the Charterers' instructions.

c) Any delay or deviation caused by or resulting from ice shall be for the Charterers' account and the Vessel shall remain on-hire.

d) Any additional premiums and/or calls required by the vessel's underwriters due to the Vessel entering or remaining in any icebound port or area, shall be for the Charterers' account.

**CLAUSE 122. JAPAN SEAWAY BILL CLAUSE**

In case of vessel's discharging at Japanese port(s), Charterers have an option to issue non- negotiable Seaway Bill(s) in lieu

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER. 2016

of Bill(s) of Lading in which case Charterers to instruct Master to release cargo without Bill(s) of Lading and Letter of Indemnity. Charterers hereby agree to indemnify Owners / Master against any consequences arising therefrom.

**CLAUSE 123.**

On arrival at the first loading port vessel's holds to be completely clean, swept, washed down by fresh water and dried up, free of salt, rust scale and previous cargo residues to the satisfaction of independent surveyors. Should the vessel not be approved by independent surveyors, then the vessel to be placed off-hire from the failure of inspections until the vessel is fully accepted and any proven expenses including bunkers consumed during off-hire incurred thereby to be for owners' account.

**CLAUSE 124.**

Charterers have the option to perform hose test at their own expense. In case vessel fails such survey Owners to rectify the same at their own time and cost and also time of the subsequent test(s) to be for Owners' account.

**CLAUSE 125.**  Vessel has existing cement holes.

## CLAUSE 126. SANCTIONS CLAUSE FOR TIME CHARTER PARTIES

(a) The Owners shall not be obliged to comply with any orders for the employment of the vessel in any carriage, trade or on a voyage which, in the reasonable judgement of the Owners, will expose the vessel, Owners, managers, crew, the vessel's insurers, or their reinsurers, to any sanction or prohibition imposed by any state, supranational or international governmental organisation.

(b)If the vessel is already performing an employment to which such sanction or prohibition is subsequently applied, the Owners shall have the right to refuse to proceed with the employment and the charterers shall be obliged to issue alternative voyage orders within 48 hours of receipt of Owners' notification of their refusal to proceed. If the Charterers do not issue such alternative voyage orders the owners may discharge any cargo already loaded at any safe port (including the port of loading). The vessel to remain on hire pending completion of Charterers' alternative voyage orders or delivery of cargo by the Owners and Charterers to remain responsible for all additional costs and expenses incurred in connection with such orders/delivery of cargo. If in compliance with this sub-clause (b) anything is done or not done, such shall not be deemed a deviation.

(c)The Charterers shall indemnify the Owners against any and all claims whatsoever brought by the owners of the cargo and/or the holders of Bill(s) of Lading and/or sub-Charterers against the Owners by reason of the Owners' compliance with such alternative voyage orders or delivery of the cargo in accordance with sub-clause.

(d) The Charterers shall procure that this clause shall be incorporated into all sub-Charterers and Bill(s) of Lading issued pursuant to this Charter Party.

## CLAUSE 127. ASIAN GYPSY MOTH CLAUSE

When Charterers direct the vessel to an area infested by AGM at Japan, South Korea and China, Charterers shall at Charterers time and expense, undertake to arrange for a certificate of gypsy moth (also known as phytosanitary certificate), which should be addressed to the plant protection organization of New Zealand, Australia, U.S.A. and Canada, to be issued by the appropriate authority for such area/port before vessels' departure from the port, certifying that the vessel is free from infestation by AGM or its eggs, and Owners shall not be held responsible for any consequences or delays at the next destined ports. Original certificate must be put on board the said vessel.

**CLAUSE 128.**

All additional insurances (including but not limited to war additional premiums, war loss of hire, kidnap and ransom and

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER. 2016

kidnap and ransom loss of hire) incurred due to following Charterers' orders/trading to exclude areas to be for Charterers' account. Premiums paid are not to exceed that available on the London market net of all rebates.

## CLAUSE 129.

Charterers' option to break International Navigating Limits but always subject to Owners underwriter advance approval, and Charterers to pay Owners extra insurance premium as per voucher from Owners underwriters. At no time is the vessel to be required to force ice or follow icebreakers without Owners' prior approval.

## CLAUSE 130. BIMCO Bunker.Quality Control Clause for Time Chartering

(1)    The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and auxiliaries and which conform to the specification(s) mutually agreed under this Charter.

(2)    At the time of delivery of the Vessel the Owners shall place at the disposal of the Charterers, the bunker delivery note(s) and any samples relating to the fuels existing on board.

(3)    During the currency of the Charter the Charterers shall ensure that bunker delivery notes are presented to the Vessel on the delivery of fuel(s) and that during bunkering representative samples of the fuel(s) supplied shall be taken at the Vessel's bunkering manifold and sealed in the presence of competent representatives of the Charterers and the Vessel.

(4)    The fuel samples shall be retained by the Vessel for 90 (ninety) days after the date of delivery or for whatever period necessary in the case of a prior dispute and any dispute as to whether the bunker fuels conform to the agreed specification(s) shall be settled by analysis of the sample(s) by (...) or by another mutually agreed fuels analyst whose findings shall be conclusive evidence as to conformity or otherwise with the bunker fuels specification(s).

(5)    The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the ship's engines or auxiliaries the Owners shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker consumption nor for any time lost and any other consequences.

## CLAUSE 131.

General average and arbitration in London and English law to apply.

## NEW BOTH TO BLAME COLLISION CLAUSE

If the vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the servants of the carrier in the navigation or in the management of the vessel, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying vessel or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

## NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER. 2016

cause whatsoever whether due to negligence or not, for which or for the consequence of which the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery.

## GENERAL CLAUSE PARAMOUNT (1982) IN BILLS OF LADING ONLY

With respect to the shipment, carriage and discharge of the cargo, whether or not this Bill of Lading regulates the relations between the carrier and holder of same, this Bill of Lading shall have effect subject to the provisions of any legislation incorporating the Rules contained in the International Convention for the Unification of Certain rules of Law relating to Bills of Lading dated Brussels August 25th 1924 (the Hague rules) or those rules as amended by the Protocol signed at Brussels February 23 1968 (the Hague Visby rules) and which is compulsorily applicable to the contract of carriage contained herein. If no such legislation is compulsorily applicable, the Hague rules or, if applicable, the Hague Visby rules as enacted in the country of the port of loading shall apply. When no such enactment is in force in the country of the port of loading, the corresponding legislation in the country of the port of discharge shall apply and in the absence of any such legislation, the terms of the 1924 Convention as amended by the 1968 Protocol shall apply.

## BIMCO STANDARD WAR RISK CLAUSES FOR TIME CHARTERS 2004 CODE NAME CON WARTIME 2004"

a)   For the purpose of this Clause, the words:

(i)   "Owners" shall include the shipowners, bareboat Charterers, Disponent Owners, Managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii)   "War Risks" shall include any actual, threatened or reported:

war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel,

(b)   The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c)   The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(d)   (i) The Owners may effect war risks insurance in respect of the Hull and Machinery of the

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER. 2016

Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

(ii)    If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

e) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the   Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery  whichever occurs first.

(f) The Vessel shall have liberty:-

 (i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose Laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii)to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national Laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv ) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v)to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g)If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h)If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

**BIMCO STANDARD BUNKER FUEL SULPHUR CONTENT CLAUSE FOR TIME CHARTER PARTIES 2005**

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER. 2016

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(I) The Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

(ii) The Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone. Subject to having supplied the Vessel with fuels in accordance with Sub- clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel s failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency."

## BIMCO PIRACY C LAUSE FOR TIME CHARTER PARTIES 2009

(a) Delete

(b) Delete

(c) If the Owners consent or if the Vessel proceeds to or through an Area exposed to the risk of Piracy the Owners shall have the liberty:

(i) to take reasonable preventative measures to protect the Vessel, her crew and cargo including but not limited to re-routeing within the Area, proceeding in convoy, using escorts, avoiding day or night navigation, adjusting speed or course, or engaging security personnel or equipment on or about the Vessel;

(ii) to comply with the orders, directions or recommendations of any underwriters who have the authority to give the same under the terms of the insurance;

(iii) to comply with all orders, directions, recommendations or advice given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group, including military authorities, whatsoever acting with the power to compel compliance with their orders or directions; and

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER. 2016

(iv) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

and the Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties caused by the Vessel proceeding as aforesaid, save to the extent that such claims are covered by additional insurance as provided in sub-clause (d)(iii).

(d) Costs

(i) If the Vessel proceeds to or through an Area where due to risk of Piracy additional costs will be incurred including but not limited to additional personnel and preventative measures to avoid Piracy, such reasonable costs shall be for the Charterers' account. Any time lost waiting for convoys, following recommended routeing, timing, or reducing speed or taking measures to minimise risk, shall be for the Charterers' account and the Vessel shall remain on hire;

(ii) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers;

(iii) If the underwriters of the Owners' insurances require additional premiums or additional insurance cover is necessary because the Vessel proceeds to or through an Area exposed to risk of Piracy, then such additional insurance costs shall be reimbursed by the Charterers to the Owners;

(iv) All payments arising under Sub-clause (d) shall be settled within fifteen (15) days of receipt of Owners' supported invoices or on redelivery, whichever occurs first.

(e) If the Vessel is attacked by pirates any time lost shall be for the account of the Charterers and the Vessel shall remain on hire.

(f) If the Vessel is seized by pirates the Owners shall keep the Charterers closely informed of the efforts made to have the Vessel released. The Vessel shall remain on hire throughout the seizure and the Charterers' obligations shall remain unaffected, except that hire payments shall cease as of the ninety-first (91st) day after the seizure and shall resume once the Vessel is released. The Charterers shall not be liable for late redelivery under this Charter Party resulting from seizure of the Vessel by pirates.

(g) If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party. In the event of a conflict between the provisions of this Clause and any implied or express provision of the Charter Party, this Clause shall prevail to the extent of such conflict, but no further.

## EU ADVANCE CARGO DECLARATION CLAUSE FOR TIME CHARTER PARTIES

(a) if the Vessel loads cargo in any EU port or place destined for a port or place outside the EU or loads cargo outside the EU destined for an EU port or place*, the Charterers shall comply with the current EU Advance Cargo Declaration Regulations (the Security Amendment to the Community Customs Code, Regulations 648/2005; 1875/2006; and 312/2009) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and in their own name, time and expense shall:

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER. 2016

(i)Have in place an EORI number (Economic Operator Registration and Identification);

(ii)Provide the Owners with a timely confirmation of (i) above as appropriate; and

(iii)Submit an ENS (Entry Summary Declaration) cargo declaration electronically to the EU Member States' Customs

and provide the Owners at the same time with a copy thereof.

(b)The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c)The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the EU Advance Cargo Declaration Regulations shall be without prejudice to the identity of carrier under any Bill of Lading, other contract, Law or Regulation.

*Recommended amendment: Since the publication of the Clause it has been noted that the EU Rules also apply to cargoes entering the EU but destined for ports outside the EU - this includes cargo kept on board and transhipments. To take account of cargoes not ultimately destined for EU ports, BIMCO recommends the following amendment to the second line of the Clause: after "...loads cargo outside the EU destined for an EU port or place" add the following words - "or passing through EU ports or places in transit"

## INTERNATIONAL GROUP OF P. & I. CLUBS FINANCIAL SECURITY IN RESPECT OF POLLUTION CLAUSE

1 .Owners warrant that throughout the currency of this Charter they will provide the vessel with the following certificates:

(a) If the vessel is over 1,000 gross tons and is registered in, or is required to enter a port or offshore facility in the territorial sea of, a State Party to the International Convention on Civil Liability for Bunker Oil Pollution Damage 2001, a Certificate issued pursuant to Article 7 of that Convention.

(b) If the vessel is constructed or adapted for the carriage of persistent oil in bulk as cargo and is carrying more than 2,000 tons of such cargo, a Certificate issued pursuant to Article 7 of the International Convention on Civil Liability for Oil Pollution Damage, 1992, as applicable.

(c) If the vessel is over 300 gross tons (or as might otherwise be required by US Federal Statutes and Regulations) and is required to enter US navigable waters or any port or place in the US, a Certificate issued pursuant to Section 1016 (a) of the Oil Pollution Act 1990, and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended, in accordance with US Coast Guard Regulations, 33 CFR Part 138.

2. Notwithstanding anything whether printed or typed herein to the contrary,

(a) Save as required for compliance with paragraph (1) hereof, owners shall not be required to establish or maintain financial security in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place,

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER. 2016

territorial or contiguous waters of any country, state or territory in performance of this Charter.

(b) Charterers shall indemnify owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) which owners may sustain due to non-compliance with any demand or requirement to establish or maintain financial security in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(c)  Without prejudice to paragraphs 2(a) and 2(b), if owners establish or maintain financial security other than to the extent provided in paragraph (1) hereof (in order to enable the vessel lawfully to enter, remain in or leave any port, place or waters), Charterers shall, unless otherwise expressly agreed, indemnify owners and hold them harmless in respect of any costs or delay incurred in establishing or maintaining such security.

(d) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any Bill of Lading issued pursuant to this Charter may sustain by reason of any requirement to establish or maintain financial security in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

3.Charterers warrant that the terms of this clause will be incorporated effectively into any Bill of Lading issued pursuant to this Charter.

## BIMCO RADIOACTIVITY RISK CLAUSE FOR TIME CHARTER PARTIES 2012

(a)The Vessel shall not be obliged to proceed or required to continue to or through or remain at, any port, place, area or zone, or any waterway or canal (hereinafter "Area") which may expose the Vessel, her cargo, crew or other persons on board the Vessel to danger from levels of ionizing radiations from or contamination by radioactivity from any nuclear fuel, nuclear waste or from the combustion of nuclear fuel, or the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or component thereof (hereinafter "Radioactivity") determined by a competent national or international authority (including but not limited to the International Atomic Energy Authority and/or the World Health Organization) to be harmful to human health.

(b) If in accordance with sub-clause (a) the Owners decide that the Vessel shall not proceed or continue to or through or remain in the Area they must immediately inform the Charterers. The Charterers shall be obliged to issue alternative voyage orders and shall indemnify the Owners for any claims from holders of the Bills of Lading caused by waiting for such orders and/or the performance of an alternative voyage. Any time lost as a result of waiting for or complying with such orders shall not be considered off-hire.

(c)The Vessel shall have liberty to comply with all orders, directions, recommendations or advice of competent authorities referred to in Sub-clause (a) and/or the Flag State of the Vessel in respect of arrival, routes, ports of call, destinations, discharge of cargo, delivery, or in any other way whatsoever.

(d) The Charterers warrant that they shall not load cargoes and/or empty containers and/or supply bunkers that have levels of Radioactivity in excess of normal radiation levels for these items. The Owners, at their discretion, may arrange for a radioactive survey by an independent qualified surveyor. If the level of Radioactivity in the cargoes, empty containers and/or bunkers is determined by the surveyor to exceed normal levels for these items, the Owners shall have the right to refuse to load such cargoes, empty containers and/or bunkers, and the cost, expense and time for the survey shall be borne by the Charterers. If radiation levels are found by the surveyor to be within normal levels for these items, the cost, expense and

ADDITIONAL CLAUSES TO MV YASA AYSEN / NORVIC
CHARTER PARTY DATED 30TH DECEMBER. 2016

time for the survey shall be borne by the Owners.

(e) Any delays arising out of measures taken by port authorities to screen the Vessel for radiation either in the countries affected by Radioactivity or at subsequent ports of call shall be for the Charterers' account. Any time lost as a result of complying with such screening shall not be considered off-hire. If the Vessel's ballast water is found to be contaminated by Radioactivity above normal levels then the cost of the safe disposal of the contaminated ballast water, decontamination of the Vessel's ballast water tanks and any delays arising out of the contamination to the Vessel shall be borne by the Charterers.

(f) If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party. In the event of a conflict between the provisions of this Clause and any implied or express provision of the Charter Party, this Clause shall prevail to the extent of such conflict, but no further.

## BIMCO STANDARD BUNKERING QUALITY AND LIABILITY CLAUSE FOR TIME CHARTER PARTIES

(a)The Charterers shall supply fuels of the agreed specifications and grades. The fuels shall be of a stable and homogeneous nature and suitable for burning in the Vessel's engines or auxiliaries and, unless otherwise agreed in writing, shall comply with ISO standard 8217:2010 or any subsequent amendments thereof.

(b) The Charterers shall be liable for any loss or damage to the Owners or the Vessel caused by the supply of unsuitable fuels and/or fuels which do not comply with the specifications and/or grades set out in sub-clause (a) above, including the off-loading of unsuitable fuels and the supply of fresh fuels to the vessel. The Owners shall not be held liable for any reduction in the Vessel's speed performance and/or increased bunker consumption nor for any time lost and any other consequences arising as a result of such supply.

## BIMCO BUNKERING OPERATIONS AND SAMPLING CLAUSE FOR TIME CHARTER PARTIES

(a) The Chief Engineer shall co-operate with the Charterers' bunkering agents and fuel suppliers during bunkering. Such cooperation shall include connecting/disconnecting hoses to the vessel's bunker manifold, attending sampling, reading gauges or meters or taking soundings, before, during and/or after delivery of fuels.

(b) During bunkering a primary sample of each grade of fuels shall be drawn in accordance with IMO Resolution MEPC.96 (47) Guidelines for the Sampling of Fuel Oil for Determination of Compliance with MARPOL 73/78 Annex VI or any subsequent amendments thereof. Each primary sample shall be divided into no fewer than seven (7) samples; one sample of each grade of fuel shall be retained on board for MARPOL purposes and the remaining samples of each grade distributed between the Owners, the Charterers and the bunker suppliers.

(c)The Charterers warrant that any bunker suppliers used by them to bunker the Vessel shall comply with the provisions of Sub-clause (b) above.

(d)Bunkers of different grades, specifications and/or suppliers shall be segregated into separate tanks within the Vessel's natural segregation. The Owners shall not be held liable for any restriction in bunker capacity as a result of segregating bunkers as aforementioned.

*THE OWNERS:*                                             *THE CHARTERERS:*

*OCEANSTAR MARITIME CO.*                        *NORVIC SHIPPING NORTH AMERICA INC*

35

# EXHIBIT 2

**Simon Johnson**

| | |
|---|---|
| From: | mvyasaaysen <mvyasaaysen@gsi-marine.com> |
| Sent: | 31 December 2016 16:08 |
| To: | 'OPS Pacific - Norvic Shipping'; 'Chartering Dry- Norvic Shipping' |
| Cc: | Yasa Shipping - Yasa Bulk |
| Subject: | YA / DELIVERY NOTICE |

| | |
|---|---|
| Follow Up Flag: | Follow up |
| Flag Status: | Flagged |

TO: NORVIC SHIPPING NORTH AMERICA INC. TORONTO
TO: WHOM IT MAY CONCERNED
CC: YASA SHIPPING
FM: MV YASA AYSEN
REF: YA-17 /2818
SUBJ:  YA / DELIVERY NOTICE

THIS IS TO CERTIFY THAT IN ACCORDANCE WITH THE TERMS OF GOVERNING CHARTER PARTY, M/V YASA AYSEN REPUBLIC OF  MARSHALL ISLANDS  NATIONALITY, OFFICIAL NUMBER 2749, HAS BEEN DELIVERED TO " NORVIC SHIPPING NORTH AMERICA INC. TORONTO " FROM "OCEANSTAR MARITIME CO.  MI AS OWNERS ,C/O YASA SHIPMANAGEMENT AND TRADING SA  AS MANAGERS " ON 01 JAN 2017 AT 0001 LT / 31 DEC 2016 AT 1601 UTC AT OUT OF CJK ANCHORAGE AREA/SHANGHAI WITH UNDERMENTIONED CONDITIONS IN ACCORDANCE WITH THE RELEVANT C/P.

BUNKER FIGURES ON DELIVERY AS FOLLOWS;

IFO: 446.58 MTS
LSMGO: 56.5 MTS

PLS CFM SAFE RECEIPT OF THIS MSG BY RETURN.

YOURS SINCERELY,

MASTER OF MV YASA AYSEN

CAPT.DEVRİM OZAN YEŞİL

Bu e-posta virüslere karşı Avast antivirüs yazılımı tarafından kontrol edilmiştir.
www.avast.com

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

1

  

升福石油有限公司

1 Commonwealth Lane #06-01/02 One Commonwealth Singapore 149544  Tel: 65-8377 1777  Fax: 65-8377 1737

(LICENCE NO: 03258)

## BUNKER DELIVERY NOTE

BDN No. 0588

| | | |
|---|---|---|
| Port | SINGAPORE | Bunker Metering Ticket No. 603 |
| Delivery Location | AESPA | Date 09/02/17 |
| Bunker Tanker's Name | ZEMIRA | Vessel's Name YASA AYSEN |
| SB No. | 584-2 | Vessel's IMO No. 9300532 |
| Alongside Vessel | 09/02/17 2330hrs | Gross Tonnage 31255 |
| Commenced Pumping | 09/02/17 5329hrs | Owner/Operator MASTER BUNKER |
| Completed Pumping | 10/02/17 0200hrs | ETD 10/02/17 |
| | | Next Port BANGLADESH |

### PRODUCT SUPPLIED

| | | |
|---|---|---|
| Product Name | MFO | Flash Point °C (ISO 2719) 72 |
| Viscosity @40°C or 50°C, mm/s (ISO 3104) | 372.5 | Sulphur Content % m/m (ISO 14596 or ISO 8754) 3.11 |
| CCQ density at 15 C, kg/m3 (ISO 3675 or ISO 12185) | 0.9908 | |
| Water Content % V/V (ISO 3733) | 0.A5 | Metric Tons Delivered 545.065 |

| SUPPLIER'S DECLARATION | MASTER'S/CHIEF ENGINEER'S ACKNOWLEDGEMENT |
|---|---|
| We declare that the bunker fuel supplied conforms with Regulations 14(1) or 14(4) and Regulation 18(1) of MARPOL 73/78 Annex VI. | We acknowledge receipt of the above product and confirm that the following samples were jointly taken by continuous drip sampler at the vessel's manifold, sealed and numbered. |

For _AS ABCVE_
Company's Name and Stamp

Signature of Cargo Officer

_Lim Jack BANG_
Full Name in Block Letters

B. Tanker's Stamp

REMARKS _NH_

Was a Note of Protest Issued?  Yes / No

| | Seal No. | Counter Seal No. (if any) |
|---|---|---|
| Vessel: | 300417 | U20516 |
| | 300418 | U20517 |
| | (MARPOL) | |
| Bunker Tanker: | 300419/20 | U20518 |
| Surveyor: | 300421 | U20519 |
| Other: LAB | 300422 | Y954108 |
| | (To specify) | (To specify) |

Was a copy of MSDS received?    Yes / No

#### CUSTOMER FEEDBACK

The following rating is satisfaction level of the bunkering operation (Please Circle):

1    2    3    4    (5)

Very Unsatisfied                    Very Satisfied

Acknowledged by _____ 0320hrs
Signature of Master/Chief Engineer/Date and Time

_HANNA BAYRAK_
Full Name in Block Letters

M/V YASA AYSEN
Vessel's Stamp

"The CCQ (Certificate of Quality) Density stated above is for fuel specification only and not for transfer quantity determination.

# EXHIBIT 3

**Simon Johnson**

| | |
|---|---|
| **From:** | Deniz Sözen Özoral - YASA Bulk <d.sozen@yasashipping.com> |
| **Sent:** | 09 May 2017 09:48 |
| **To:** | OPS-Howe Robinson |
| **Cc:** | Yasa Shipping - Chartering |
| **Subject:** | RE: MV YASA AYSEN/NORVIC CP DD 30.12.2016/REDELY & PFHS |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

REF: DSO090517-1388

GOOD DAY,

JITENDER/DENIZ

RE: MV YASA AYSEN/NORVIC CP DD 30.12.2016/REDELY & PFHS
--

PLS BE INFORMED TT VSL IS REDELIVERED TO OWNERS AS PER MASTER MSG BELOW.

CHRTS PLS SEND THEIR PFHS BREAKDOWN AND REMITTANCE DETS ASAP.

WAITING YRS.

THANKS.

QTE//

**From:** mvyasaaysen [mailto:mvyasaaysen@gsi-marine.com]
**Sent:** Tuesday, May 9, 2017 11:16 AM
**To:** 'OPS Pacific - Norvic Shipping'; 'Sukhmeet Kaur - Norvic Shipping'; Yasa Shipping - Yasa Bulk
**Cc:** chartering@norvicshipping.com
**Subject:** YA / RE-DELIVERY NOTICE

TO: NORVIC SHIPPING NORTH AMERICA INC. TORONTO
TO: YASA SHIPPING
FM: MV YASA AYSEN
REF: YA-17/ 1072
SUBJ: YA / RE-DELIVERY NOTICE


DEAR SIRS,

M/V YASA AYSEN UNDER MY COMMAND IS REDELIVERED TO HEAD OWNER 'OCEANSTAR MARITIME CO.' MI AS
OWNERS C/O 'YASA SHIPMANAGEMENT AND TRADING S.A AS MANAGERS' FROM CHARTERERS " NORVIC SHIPPING
NORTH AMERICA INC. TORONTO " ON 09th MAY 2017 AT 1350 LT / 09th MAY 2017 0750 UTC ,DLOSP
MONGLA/BANGLEDESH WITH UNDERMENTIONED CONDITIONS IN ACCORDANCE WITH THE RELEVANT C/P.

ROB BUNKERS AT REDELIVERY AS FOLLOWS :

IFO : 970.3 MTS

LSMGO : 48.3 MTS

1

PLS CFM SAFE RECEIPT OF THIS MSG BY RETURN.


BRGDS/MASTER

//UNQTE


REGARDS,

**DENİZ SÖZEN ÖZORAL**
**CHARTERING DEPARTMENT**


 **YA/SA**®

**YA-SA Shipmanagement & Trading S.A**
**As Managers Only**
**Kucuk Camlica Mah. Uc Pinarlar Cad. No:40**
**34696 K.Camlica Istanbul/TURKEY**
☎ **Pho : +90 216 532 92 72**
🖷 **Fax : +90 216 341 92 72**
✉**E-mail : d.sozen@yasashipping.com**
🖥 **Web : http://www.yasaholding.com**
🌲**Save a tree. Don't print this e-mail unless it's really necessary.**

# EXHIBIT 4

| YA- NORVIC -PFHS | | | | |
|---|---|---|---|---|
| **Vessel Name:** | MV YASA AYSEN | | | |
| **Account:** | NORVIC | | | |
| **C/P Date:** | 30.12.2016 | | **DEBIT** | **CREDIT** |
| Fm: | 31.12.2016 16:01 | | | |
| Till: | 9.05.2017 07:50 | | | |
| Duration: | 128,6590 | X | $5.000,00 | $643.295,14 |
| CVE | 128,6590 | X | $1.500,00 | $6.432,95 |
| add comm | 3,75 | | $24.123,57 | |
| brok comm | 1,25 | | $8.041,19 | |
| | | ECO | | |
| IFO | 446,580 | X | $345,00 | $154.070,10 |
| LSGO | 56,5 | X | $500,00 | $28.250,00 |
| | | BOR | | |
| IFO | 425,235 | X | $345,00 | $146.706,08 |
| LSGO | 48,3 | X | $500,00 | $24.150,00 |
| | | Offhire at Spom due to Owners business | | |
| Fm: | 9.02.2017 22:30 | | | |
| Till: | 10.02.2017 02:30 | | | |
| Duration: | 0,1667 | X | $5.000,00 | $833,33 |
| CVE | 0,1667 | X | $1.500,00 | $8,33 |
| add comm | 3,75 | | | $31,25 |
| brok comm | 1,25 | | | $10,42 |
| | | PLOHC | | |
| ILOHC | | | | $5.500,00 |
| | | CHRTS EXPENSES | | |
| U/W Compensation | | | | $17.500,00 |
| Mongla agent expenses | | | | $19.094,93 |
| bai | | | | $520,00 |
| | | OWNERS EXPENSES | | |
| est onhire survey | | | $450,00 | |
| est offhire survey | | | $250,00 | |
| | | REMITTED HIRES | | |
| 1st hire | | | $72.000,00 | |
| 2nd hire | | | $72.000,00 | |
| 3rd hire | | | $43.200,00 | |
| 4th hire | | | $48.000,00 | |
| 5th hire | | | $17.720,10 | |
| 6th hire | | | $24.000,00 | |
| 7th hire | | | $24.000,00 | |
| 8th hire | | | $9.600,00 | |
| | | | $515.082,60 | $874.704,79 |
| balance in favor of owns | | | $359.622,19 | |

**BANK:**
DVB Bank SE | Platz der Republik 6 | 60325 Frankfurt | Germany |
Tel +49 69 9750 4120 | Mobile +49 173 7407 755 | Fax +49 69 9750 4900 |
Derya.Cakmak@dvbbank.com | www.dvbbank.com
Beneficiary Details:
IBAN: DE02501103002910060896
USD-Earnings Account:
Account Name: **Oceanstar Maritime Co.**
SWIFT: DVKBDEFF
DVB Bank SE
Correspondent bank:
HSBC Bank USA, NY
SWIFT: MRMDUS33
FW/ABA Routing code: 021001088
Account number:

**Simon Johnson**

| | |
|---|---|
| From: | Deniz Sözen Özoral - YASA Bulk <d.sozen@yasashipping.com> |
| Sent: | 10 April 2017 08:59 |
| To: | OPS-Howe Robinson |
| Cc: | Yasa Shipping - Chartering |
| Subject: | RE: MV YASA AYSEN/NORVIC/MONGLA BOTTOM FOULING |

REF: DSO100417-0927

GOOD DAY,

JITENDER/DENIZ

RE: MV YASA AYSEN/NORVIC/MONGLA BOTTOM FOULING

--

PLS SEE HEREBELOW BOTTOM FOULING NOTICE SENT BY MASTER DUE TO PROLONGED STAY AT MONGLA OVER 26 DAYS.

OWNERS ALL RIGHTS ARE FULLY RESERVED.

QTE//

**From:** mvyasaaysen [mailto:mvyasaaysen@gsi-marine.com]
**Sent:** Sunday, April 9, 2017 2:46 PM
**To:** 'OPS Pacific - Norvic Shipping'; 'Sukhmeet Kaur - Norvic Shipping'
**Cc:** Yasa Shipping - Yasa Bulk
**Subject:** YA / YASA AYSEN-MONGLA BOTTOM FOULING

TO: NORVIC SHIPPING NORTH AMERICA INC. TORONTO
CC: YASA SHIPPING
FM: MV YASA AYSEN
REF: YA-17/0895
SUB: YA / YASA AYSEN-MONGLA BOTTOM FOULING

GOOD DAY,

MY VESSEL HAS ARRIVED MONGLA ON 13.MAR.2017 AND SHE IS STILL THERE FOR A CONSIDERABLE LONG TIME WHICH EXCEEDED 26 DAYS ALLOWED UNDER CHARTER PARTY.

MONGLA IS WELL KNOWN WARM WATERS PORT CAUSING EXCESSIVE FOULING TO SHIP'S UNDERWATER AREA.

THUS ON BEHALF OF MY OWNERS, I HEREBY PUT OUR ESTEEMED CHARTERERS ON NOTICE THAT THE VESSEL AND / OR OWNERS WILL NOT BE RESPONSIBLE FOR ANY INCONVENIENCES INCLUDING BUT NOT LIMITED TO SPEED UNDERPERFORMANCE / EXCESSIVE SLIP AND / OR BUNKER OVERCONSUMPTION ARISING FROM THE BOTTOM FOULING OF THE VESSEL DUE TO LONG STAY AT MONGLA.

FURTHER ANY EVENTUAL UNDERWATER CLEANING EXPENSES WHICH MAY BE DEEMED NECESSARY BY OWNER TO BE SOLELY FOR ACCOUNT OF CHARTERERS. KINDLY BE NOTIFIED ACCORDINGLY.

PLS CFM SAFE RECEIPT OF THIS MSG BY RETURN.

1

BRGDS/MASTER

//UNQTE

REGARDS,

DENİZ SÖZEN ÖZORAL
CHARTERING DEPARTMENT

 **YA/SA**®

**YA-SA Shipmanagement & Trading S.A**
**As Managers Only**
Kucuk Camlica Mah. Uc Pinarlar Cad. No:40
34696 K.Camlica Istanbul/TURKEY
☎   Pho : +90 216 532 92 72
🖷 Fax  : +90 216 341 92 72
✉E-mail : d.sozen@yasashipping.com
🖥 Web  : http://www.yasaholding.com
🌱Save a tree. Don't print this e-mail unless it's really necessary.

Simon Johnson

| | |
|---|---|
| From: | Deniz Sözen Özoral - YASA Bulk <d.sozen@yasashipping.com> |
| Sent: | 04 May 2017 08:11 |
| To: | Park Shipping Line; Yasa Shipping - Yasa Bulk |
| Cc: | Ops Asia - Norvic Shipping; opsparkship@gmail.com; parklog@colbd.com |
| Subject: | RE: [BULK] RE: M.V.YASA AYSEN is going to release |

| | |
|---|---|
| Follow Up Flag: | Follow up |
| Flag Status: | Flagged |

REF: DSO040517-1309

GOOD DAY,

ROBBANI/DENIZ

RE: [BULK] RE: M.V.YASA AYSEN is going to release
--

NOTED BELOW.

WE WILL REVERT WITH REMITTANCE CONFIRMATION.

REGARDS,

DENİZ SÖZEN ÖZORAL
CHARTERING DEPARTMENT

YA-SA Shipmanagement & Trading S.A
As Managers Only
Kucuk Camlica Mah. Uc Pinarlar Cad. No:40
34696 K.Camlica Istanbul/TURKEY
/  Pho : +90 216 532 92 72
P Fax : +90 216 341 92 72
E-mail : d.sozen@yasashipping.com
d Web : http://www.yasaholding.com
•Save a tree. Don't print this e-mail unless it's really necessary.

-----Original Message-----
From: Park Shipping Line [mailto:parkship@colbd.com]
Sent: Thursday, May 4, 2017 7:50 AM
To: Deniz Sözen Özoral - YASA Bulk; Yasa Shipping - Yasa Bulk
Cc: Ops Asia - Norvic Shipping; opsparkship@gmail.com; parklog@colbd.com
Subject: RE: [BULK] RE: M.V.YASA AYSEN is going to release

Kind attn: Ms.DEN SÃ-ZEN Ã-ZORAL CHARTERING DEPARTMENT Dear Madam,

1

43

Ref to your below query, pls note the following :-

Norvic Shipping paid to us all dues upto 10-04-2017 Now we have request to your goodself for payment upto sailing (may be on 11-05-2017) so that we can sail the vessel in time without any delay.

PDA details are as under:-

1) Port dues payable (2nd month from 10-04-2017 to 10-05-2017 ) USD0.060 x 31,255=-USD1,875.30
  2)Light dues (next month) 18,505(NRT) X TK 5 = Equivalent USD1,186.21 (up to 10-05-2017)
03) Anchorage hire from 11-04-2017 to
11-05-2017=31 days X USD468.82=USD14,533.42
04) Additional commission for handling the vessel after completion of cargo discharging up to court arrest order withdrawal /vacating/ releasing sailing  the vessel USD 1500.00(lumpsum basis) TOTAL USD 19,094.93.

Pls arrange to remit the fund at the earliest so that we can sail the vessel in time.

For your ready reference we furnish below our bank Details :

Account no.: 01-6956416-01
Beneficiary name: PARK SHIPPING LINE
Bank name: STANDARD CHARTERED BANK
SK. MUJIB ROAD, AGRABAD C / A,
CHITTAGONG 4100, Bangladesh.
SWIFT code: SCBLBDDX
Corresponding bank:
STANDARD CHARTERED BANK, NEW YORK
SWIFT code: SCBLUS33XXX


With kind rgds
Robbani
+++++++




At 07:06 PM 03-05-17, Deniz SÃ¶zen Ã-zoral - YASA Bulk wrote:
>REF: DSO030517-1302
>
>GOOD DAY,
>
>ROBBANI/DENIZ
>
>RE: [BULK]  RE: M.V.YASA  AYSEN is going  to release
>--
>
>NOTED BELOW.
>
>AS PER OUR ACCOUNT DEPARTMENT REQUEST, PLS ALSO SEND PDA.
>
>WAITING YRS.
>
>
>REGARDS,
>Â

2

44

**Simon Johnson**

From:            Deniz Sözen Özoral - YASA Bulk <d.sozen@yasashipping.com>
Sent:            23 February 2017 08:30
To:              OPS-Howe Robinson
Cc:              Yasa Shipping - Chartering
Subject:         RE: MV YASA AYSEN/NORVIC/BAI-SPORE
Attachments:     20170223101825.pdf; 20170223101811.pdf

REF: DSO230217-0414

GOOD DAY,

JITENDER/DENIZ

RE: MV YASA AYSEN/NORVIC/BAI-SPORE
--

PLS SEE ATTACHED BUNKER ANALYSIS INVOICES FOR CHRTS SUPPLIES AT SPORE.

PLS REIMBURSE USD 520 WITHIN NEXT HIRE ACCY.

THANKS.


REGARDS,

**DENİZ SÖZEN ÖZORAL**
**CHARTERING DEPARTMENT**

 **YA/SA®**
**YA-SA Shipmanagement & Trading S.A**
**As Managers Only**
**Kucuk Camlica Mah. Uc Pinarlar Cad. No:40**
**34696 K.Camlica Istanbul/TURKEY**
☎  **Pho : +90 216 532 92 72**
▩ **Fax : +90 216 341 92 72**
✉**E-mail : d.sozen@yasashipping.com**
🖳 **Web : http://www.yasaholding.com**
🖫**Save a tree. Don't print this e-mail unless it's really necessary.**

1



VISWALAB

UNIT ID:

YASA AYSEN

INVOICE ADDRESS:

OCEANSTAR MAR.CO.
TRUST COMPANY COMPLEX
AJELTAKE ROAD AJELTAKE ISLAND
C/O YASA GEMI ISL. VE TIC. A.S.
MAJURO

| VLC Log No | Bunkering Port | Bunkering Date | Sample Type | Invoice Date | Invoice No: |
|---|---|---|---|---|---|
| S170276001 | SINGAPORE | 09/02/2017 | IFO380 | 13/02/2017 | V2325 |
| VLC Log Date | Place Sent | Date Sent | Grade | Suppl. / Barge | Quantity |
| 10/02/2017 | SINGAPORE | 10/02/2017 | RMG380 | CATHAY | 678.051 |

| Description | Quantity | Price | Amount USD |
|---|---|---|---|
| Reg.Analys.of Marin. Resid.Sample W/Asphaltene | 1.00 | 260.00 | 260.00 |
| | | | |
| | INVOICE AMOUNT TOTAL USD | | 260.00 |

Payment Terms : 30 DAYS AFTER DATE OF INVOICE
Account Holder :ILFE SHIPPING COMPANY LTD.
Bank: GARANTI BANKASI - KARAKOY BRANCH - ISTANBUL, ACCOUNT NO: 9003598
IBAN: TR82 0006 2000 4000 0009 0035 98

**ILFE SHIPPING LTD.**
126 Atocia Street Hamrun - MALTA
Phone: +356 21 251 479 Fax: +356 21 251 478
uniservice@uniservice.com.tr • info@ilkfer.com.tr



46



UNIT ID:

YASA AYSEN

INVOICE ADDRESS:

OCEANSTAR MAR.CO.
TRUST COMPANY COMPLEX
AJELTAKE ROAD AJELTAKE ISLAND
C/O YASA GEMI ISL. VE TIC. A.S.
MAJURO

| VLC Log No | Bunkering Port | Bunkering Date | Sample Type | Invoice Date | Invoice No: |
|---|---|---|---|---|---|
| S170276060 | SINGAPORE | 09/02/2017 | MGO | 13/02/2017 | V2327 |
| VLC Log Date | Place Sent | Date Sent | Grade | Suppl. / Barge | Quantity |
| 13/02/2017 | SINGAPORE | 13/02/2017 | DMALS | TRANSOCEAN | 18.047 |

| Description | Quantity | Price | Amount USD |
|---|---|---|---|
| Regular Analysis of Marine Residual Sample | 1.00 | 260.00 | 260.00 |
| | | INVOICE AMOUNT TOTAL USD | 260.00 |

Payment Terms : 30 DAYS AFTER DATE OF INVOICE
Account Holder :ILFE SHIPPING COMPANY LTD.
Bank: GARANTI BANKASI - KARAKOY BRANCH - ISTANBUL, ACCOUNT NO: 9003598
IBAN: TR82 0006 2000 4000 0009 0035 98

**ILFE SHIPPING LTD.**
126 Atocia Street Hamrun - MALTA
Phone: +356 21 251 479 Fax: +356 21 251 478
uniservice@uniservice.com.tr • info@ilkfer.com.tr



47

# EXHIBIT 5



HOME    PROFILE ⌄    OUR SERVICES ⌄    CONTACTS ⌄

**07**
AUG
2017

# Norvic Shipping North America Inc. is now Norvic Shipping International Ltd.

 HENRIK     NEWS     0

Norvic's business areas are expanding steadily and in addition to our corporate headquarters in Toronto, we now have offices in Copenhagen, Houston, Mumbai, New Delhi, Dubai, and Singapore.

To better reflect our international expansion, we are now doing all of our dry bulk ocean transportation under the name of **Norvic Shipping International Ltd.**

# What does this mean for our partners?

There is no change to the management of the company. The company continues to have a permanent establishment in Canada and it continues to be wholly owned by the same Canadian parent/holding company as in the past.

This change reflects our expanding global reach, in tandem with our continued emphasis on the high-quality of service offered across the Norvic group of companies worldwide. Our business partners can still expect the same level of service they have become accustomed to. Our day-to-day services will continue as usual and business processes remain unchanged.

CORPORATE HEAD OFFICE

CONTACT

**Norvic Shipping International Ltd.**
SSQ Place
110 Sheppard Avenue
East, Suite # 309
P.O. Box 6
Toronto, Ontario M2N

Norvic Shipping International Ltd. is our new official name

6Y8, Canada

Tel: +1 416 673 9500
(Switch Board)
Fax: +1 416 224 8830
email:
corporate@norvicshipp
ing.com

A concern of Norvic
Maritime Group,
Canada



WEBMASTER: NORDIC WEB DESIGN